**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

RANDALL BYRNE, DAVID
KLEUSKENS, JERRY HENRY, JASON
WEBER, and SUSAN FOSTER-HARPER,
on behalf of themselves and all others
similarly situated,

          Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
HOLDINGS, LLC, CHARTER
COMMUNICATIONS OPERATING,
LLC, and SPECTRUM MANAGEMENT
HOLDING COMPANY, LLC,

          Defendants.

**Case No.:  3:20-cv-00712**

**JURY TRIAL DEMANDED**

**COMPLAINT**

      Plaintiffs, Randall Byrne, David Kleuskens, Jerry Henry, Jason Weber, and Susan Foster-Harper, bring this Complaint against Defendants Charter Communications, Inc., Charter Communications Holdings, LLC, Charter Communications Operating, LLC, and Spectrum Management Holding Company, LLC (collectively "Charter"), and respectfully allege as follows:

**INTRODUCTION**

      1.    This case arises from a bait-and-switch scheme whereby Charter advertises to consumers that its cable television service packages will have a fixed monthly rate for a period of one to two years, but after consumers sign up or renew their service for the promised fixed-rate

1992930.3

period, Charter deceptively increases the monthly rate in multiple    deceptive ways. Charter obscures the increases, deceives customers about their purpose, and makes it difficult for customers to cancel service.

2.      Four ways Charter deceptively increases its monthly rate during the promised fixed-rate period are: (1) imposing and increasing a so-called "Broadcast TV Surcharge"; (2) pegging customer discounts to a list price rate, increasing that list price rate, and increasing the customer's "discounted" rates with it; (3) removing channels originally presented as part of the package and then charging extra for them; and (4) increasing the monthly price of customer equipment such as cable boxes which are utilized by customers to receive television service.

3.      The first way Charter deceptively increases its monthly rate is by adding a "Broadcast TV Surcharge" to each monthly bill for every customer, and systematically and regularly increasing this "surcharge." Charter introduced the Broadcast TV Surcharge in 2010, at about $1 per month, but has steadily increased it, such that the Broadcast TV Surcharge is now $13.50 per customer per month, or $162 per customer per year. Charter increased the monthly Broadcast TV Surcharge three times between November 2018 and October 2019 alone, by a total of $4.65 per customer per month. Charter has deliberately rolled out the Broadcast TV Surcharge and increased its amount in a manner designed to further ensure that the charge and increases go unnoticed by customers. When customers call to complain about the Broadcast TV Surcharge after they learn about it, Charter's agents tell customers that the Surcharge is a tax or government fee or is otherwise out of Charter's control. But the Broadcast TV Surcharge is entirely within Charter's control, and Charter alone decides whether to charge it and how much to charge. The Broadcast TV Surcharge is not a legitimate surcharge, but is instead simply a way for Charter to charge more per month for its basic service without having to advertise the actual, higher price.

Any costs Charter pays to carry local channels are part of the inherent cost of Charter's business of providing television services. In addition, for many Charter customers who subscribe to a "legacy" Time Warner Cable television package (Charter acquired Time Warner Cable in 2016), Charter also adds a similar inadequately disclosed "Sports Programming Surcharge" to their bill as a way to charge more per month for Charter's service than the lower promised price. Time Warner Cable introduced the Sports Programming Surcharge in 2015.

4.      The second way Charter deceptively increases its monthly rate is by promising customers a specific "discounted" monthly price, without disclosing that the "discount" is in fact pegged to a list price rate in the form of a dollar amount discount from that list price rate. Charter then increases the list price rate at its whim, and raises the customer's monthly "discounted" rate in lockstep with the standard price. In other words, Charter deceives customers into believing they are signing up for a flat, discounted monthly rate that will not change during the promotional one- or two-year period, when in fact Charter structures the discount, for billing purposes, as a flat *discount amount*, such that the customer's "discounted" monthly rate increases alongside any increases Charter chooses to make to its list price rate during the customer's promotional period. This is yet another way Charter deceives customers into signing up for what they think is a set rate for a set period, but where Charter actually reserves for itself the ability to arbitrarily increase that rate at any time. Charter does this even though its website plainly states that the promotional price of its cable services packages will be fixed for the promotional period; for example, as of the date of the filing of this complaint, Charter's website reads, "Price for TV Select and Internet is $89.98/mo for yr. 1; standard rates apply after yr 1."

5.      The third way Charter effectively increases its monthly rate during a promised fixed-rate period is by removing channels originally presented as part of the cable television

service package and then charging additional fees to include them going forward. Charter lists on its website each and every channel included with each of its cable television service packages, but later removes channels, such as the Cinemax movie channels, that were described to be included in the cable television service package at the time customers signed up, and then informs customers that they must pay an additional fee to continue to access the removed channels. After offering a certain price for a certain service for a certain period of time, but later requiring additional fees to continue access for certain aspects of that service in the middle of that time period, Charter effectively increases the total price for the same service.

6.      The fourth way Charter increases its monthly rate during a promised fixed-rate period is by increasing the monthly price of customer equipment such as cable boxes which are utilized by customers to receive television service. After promising a flat specific price per month which includes the cost of the equipment, Charter later increases the monthly rate by increasing its charges for that equipment. For example, Charter regularly increases the charges for "Spectrum Receivers" (i.e., the cable boxes required to receive the cable television channels) in the middle of a promised fixed-rate period.

7.      Through this bait-and-switch scheme, Charter has unfairly and improperly extracted billions of dollars in ill-gotten gains from consumers across the country, including those in Ohio and Kentucky.

8.      Plaintiffs seek, on behalf of themselves and classes of all similarly situated consumers, awards of damages, restitution, pre- and post-judgment interest, attorneys' fees and costs, and permanent injunctive relief.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this

Case 3:20-cv-00712-CSH   Document 1   Filed 05/21/20   Page 5 of 51

is a proposed class action in which there are members of the proposed Class who are citizens of a state different from Charter.

10.     This Court has personal jurisdiction over Charter because Charter's headquarters and principal place of business are in this District, in Stamford, Connecticut.

11.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Defendant's headquarters and principal place of business are in this District, and many of the acts and transactions giving rise to this action occurred in this District.

## PARTIES

12.     Plaintiff Randall Byrne is a citizen and resident of Powell, Ohio.

13.     Plaintiff David Kleuskens is a citizen and resident of Miamisburg, Ohio.

14.     Plaintiff Jerry Henry is a citizen and resident of Florida who typically resides in his Columbus, Ohio home during the May through October months.

15.     Plaintiff Jason Weber is a citizen and resident of Louisville, Kentucky.

16.     Plaintiff Susan Foster-Harper is a citizen and resident of Versailles, Kentucky.

17.     Defendant Charter Communications, Inc. is a Delaware corporation with its principal place of business located at 400 Atlantic Street, Stamford, Connecticut 06901. Charter Communications, Inc. is a holding company whose principal asset is a controlling equity interest in Charter Communications Holdings, LLC.

18.     Defendant Charter Communications Holdings, LLC is a Delaware limited liability company with its principal place of business located at 400 Atlantic Street, Stamford, Connecticut 06901. Charter Communications Holdings, LLC is a holding company and the parent company of Charter Communications Operating, LLC.

19.     Defendant Charter Communications Operating, LLC is a Delaware limited liability company with its principal place of business also located at 400 Atlantic Street,

-5-

1992930.3

Stamford, Connecticut 06901. Charter Communications Operating, LLC is a wholly owned subsidiary of Charter Communications, Inc. and is the entity under which substantially all of Charter's operations reside.  Its members are residents of Connecticut and Missouri.

20.     Defendant Spectrum Management Holding Company, LLC is a Delaware limited liability company with its principal place of business also located at 400 Atlantic Street, Stamford, Connecticut 06901. In May 2016, Time Warner Cable, Inc. was merged into a subsidiary of Charter Communications, Inc. and changed its name to Spectrum Management Holding Company, LLC.

21.     Charter transacts business in this District and throughout the United States.

22.     Charter sells cable television, broadband internet, and phone service under the brand name Spectrum. Any references to Spectrum in this complaint refer to Defendants.

## COMMON FACTUAL ALLEGATIONS

23.     Charter's pricing of its cable television service packages operates as a bait and switch scheme. The *bait* is a supposedly fixed monthly rate, which Charter advertises on television and the internet, which Charter promotes on its website, and which its sales and customer service agents quote and promise over the phone. The *switch* is higher and ever-increasing monthly rates, through at least four schemes that conceal the increases and/or deceive customers about their purpose. In sum, Charter induces new customers with low prices but then charges a higher price without giving its customers the services they signed up for. In doing so, Charter avoids advertising its true prices, thereby harming consumers.

### A.     The Bait: A Supposedly Fixed Monthly Rate

24.     Charter sells cable service packages which include television service. At all relevant times, Charter has aggressively advertised its plans through pervasive marketing directed at the consuming public in Ohio and Kentucky and throughout the United States,

including via high-profile television, radio, print (including mailings) and online advertisements. Charter also advertises its plans on its website and at its Spectrum-branded retail stores.

25.     Across all its advertising channels, Charter consistently and prominently advertises a flat, fixed monthly rate for its television service and cable service packages which include television service.

26.     For years, Charter has not disclosed that it actually increases those promised fixed monthly rates through multiple schemes. Among other omissions, Charter does not fully or accurately disclose the existence or amount of its Broadcast TV Surcharge prior to sign-up, and does not disclose that it periodically *increases* that surcharge (and thus customers' monthly rates) at its discretion.

### 1.     Charter Advertises a Fixed Monthly Rate

27.     Charter has advertised its fixed-rate plans through numerous video advertisements, shown on television and on the internet. These advertisements quote a flat monthly rate—for example, "29.99/mo."—with no asterisk or fine print shown alongside the quoted rate. Some of these ads have no fine print or other disclosure about surcharges or price increases whatsoever. Other ads have displayed fine print during the ads' final seconds that is at best a large block of difficult or impossible to read fine print using vague language that "install, taxes, fees, surcharges, & other equipment extra."

28.     For example, two of Charter's 2019 ads that aired on TV and on the internet offered "Spectrum TV: $44.99/a month. NO CONTRACT" with zero disclosures about additional surcharges or price increases.[1] A 2020 Charter ad that is still airing on TV as of the

---

[1] https://www.ispot.tv/ad/oSzy/spectrum-tv-and-internet-make-the-switch-200-mbps; https://www.ispot.tv/ad/ouSI/spectrum-tv-internet-upside-down

date of this complaint offers "Spectrum TV: $44.99/mo for 12 months when bundled. NO CONTRACT," again without any disclosures about additional surcharges or price increases.[2]

29.    Charter has aired ads condemning competitors for hidden costs and lying to customers, without disclosing its own hidden costs and misrepresentations.[3]

### 2.    Customer Sales Agents Quote a Fixed Monthly Rate

30.    When consumers contact Charter sales agents (by phone, in its retail stores, or online via chat) to discuss and sign up for Charter television services or for cable bundles which include television service, Charter sales agents present consumers with the advertised *flat monthly price* and assure consumers that the monthly price will stay the same—and will not increase—for a period of 12 to 24 months (one to two years).  Likewise, when existing customers contact Charter customer service or sales agents to change their service plan or to inquire about available discounts and plans, Charter agents offer and quote them service plans at a promised flat monthly price and assure the customers that the monthly price will stay the same—and will not increase—for one to two years. On information and belief, Charter agents are trained and instructed to make these statements as a matter of company policy.

31.    On information and belief, Charter's sales and customer service agents are instructed, if a potential customer asks a Charter agent what, if anything, will be charged on top of the quoted flat monthly price, to reply that the only additions to the quoted price (besides additional equipment or voluntarily chosen extra services) are taxes or other government-related fees passed on by Charter to the customers. On information and belief, Charter instructs its agents to refrain from disclosing the existence of any so-called surcharges imposed by Charter that are not related to government fees—and in fact agents assert that none exist. Instead, Charter

---

[2] https://www.ispot.tv/ad/ZpD9/spectrum-stage
[3] https://www.ispot.tv/ad/wPEX/spectrum-wink

agents promise that the cable television service package will cost a fixed, unchanging, monthly price for the entirety of the promotional or renewal period.

### 3.   Charter's Website Quotes a Fixed Monthly Rate

32.   Consumers can sign up for Charter's cable television service packages through Charter's website. And many customers who sign up for or renew Charter's television service via telephone, first view and research Charter's prices online on Charter's website.

33.   Charter's sales website, today and for years, quotes and has quoted a flat, fixed monthly rate for an initial promotional period, for example, "44.99/mo each for 12 mos when bundled**" for TV and internet service. If customers scroll to the very bottom of the initial offer webpage, Charter includes varying fine print or links to pages with further terms.

34.   The fine print on Charter's initial offer webpage has consistently stated that the promised rate would stay fixed during the promotional period, with language such as "Price for TV Select and Internet is $89.98/mo or yr. 1; standard rates apply after yr 1" (which is the language on Charter's website as of the date of the filing of this complaint).

35.   Based on the investigation of Plaintiffs' counsel, until very recently (and no earlier than August 2019), the fine print or linked terms on this initial offer webpage did not disclose the existence or amount of the Broadcast TV Surcharge. At most, the fine print included language that "Installation, equipment, taxes, fees and surcharges extra," without specifying any such surcharges or their amounts.

36.   To Plaintiffs' knowledge, at no time in the past or at the present has Charter's initial offer webpage, or the web sign-up process, adequately disclosed that Charter might choose to increase the quoted monthly rate for television service (through one of the schemes described herein) during the promotional period.

37.     When a consumer selects a desired service bundle on Charter's initial offer webpage, they are sent to a webpage to choose the options for which they would like to sign up. These sign-up pages allow customers to select various additional services or upgrades on the left side of the webpage and list costs for each chosen line item on the right side of the webpage, each of which is presented as having a fixed monthly charge. This webpage also shows a full list of channels included with each available television package.

38.     In September 2017—and for years earlier—the line item costs for television service (and for other selected services such as internet and phone) were summed into a total on the right side of the webpage alongside the text "Monthly Costs*". If the customer did not choose additional options, then the amount listed as the total monthly rate was identical to that quoted on the initial offer webpage. If the consumer scrolled down past all optional services on the left side, at the very bottom of the page below the copyright was a link in small text reading "*Product and Offer Disclaimers." If the consumer saw and clicked that link, a long list of disclaimers would open, including a quoted flat monthly fee for each service package, such as "Single Play TV Select: Promotion price is $39.99/mo. for 12 months; standard rates apply after one year. …surcharges may apply." No specific surcharges were disclosed.

39.     At some time between September 2017 and August 2018, Charter modified the online order process by adding—for the first time—a line item listed as "Broadcast Fee" with a specific monthly amount listed ($8.85 in August 2018, $11.99 in August 2019, etc.). Both the listed subtotal for the "Broadcast Fee" and the listed total monthly rate falsely represented that these would be *fixed* rates for the duration of the promotional period. The website does not suggest or disclose that Charter might (and would) choose to raise the Broadcast Fee (i.e., the Broadcast TV Surcharge)—and thus the total monthly rate—during the promotional period.

-10-

40.     As of, and prior to, August 2018, the "Broadcast Fee" listed on Charter's sign-up webpage included no additional information, context, or description of its purpose. At some time between August 2018 and August 2019, Charter added a small "i" information icon next to "Broadcast Fee." If a consumer hovers the cursor over the "i" icon, a text box appears, reading: "The Broadcast TV Surcharge is a fee by the owners of local broadcast 'network-affiliated,' TV stations (affiliates of CBS, NBC, ABC, Fox, and so on). The fee enables Spectrum to continue to offer these channels for our customers." This description is false: in fact, the Broadcast TV Surcharge is not a fee "by" local broadcast TV stations, but is a fee whose existence and amount is determined and charged by Charter alone. There is no equivalent fee charged by local broadcast TV stations that Charter is passing on to its customers through the Broadcast TV Surcharge. Any costs Charter pays to carry local channels are part of the inherent cost of Charter's business of providing television services.

41.     After a consumer clicks "CONTINUE" under the quoted monthly rate on the webpage described above, the consumer is taken to a final webpage to submit the order. On the order submission webpage the same line items, subtotal, and total monthly charges are shown on the right. The submission webpage offers a link to Charter's Residential Terms of Service. These terms contain no disclosure of any specific surcharges; the Terms of Service contain only vague references to the possible existence of surcharges in general.

**B.      The Switch: A Rising Rate**

42.     Although Charter represents to prospective and existing customers that it offers fixed monthly rates for a one- or two-year service period as alleged above, Charter in fact raises customers' rates above the fixed monthly rates Charter previously represented.

-11-

43.     Charter achieves these deceptive price increases through at least four bait-and-switch schemes further described below: (1) imposing and increasing the so-called "Broadcast TV Surcharge"; (2) pegging customer discounts to a list price rate, increasing that list price rate, and increasing the customer's "discounted" rates with it; (3) removing channels originally presented as part of the package and then charging extra for them; and (4) increasing the monthly price of customer equipment such as cable boxes which are utilized by customers to receive television service.

### 1.     Bait & Switch Scheme 1: Broadcast TV Surcharge

44.     Charter first introduced its so-called "Broadcast TV Surcharge" in 2010. The Broadcast TV Surcharge is a monthly fee Charter charges to its television services customers at a uniform rate across the country.

45.     Charter acquired competing television service provider Time Warner Cable in May 2016. Time Warner Cable had also charged a Broadcast TV Surcharge, and after Charter acquired Time Warner Cable, Charter continued charging former Time Warner Cable customers the Broadcast TV Surcharge, which Charter adjusted to match its nationwide monthly surcharge amount. Charter also has continued to charge many former Time Warner Cable customers, such as Plaintiff Susan Foster-Harper, who subscribe to a "legacy" Time Warner Cable package, a so-called "Sports Programming Surcharge" in addition to the Broadcast TV Surcharge.

46.     The lowest monthly amount for the Broadcast TV Surcharge of which Plaintiffs are aware was $0.94 in October 2010. Over the subsequent months and years, Charter continually increased the Broadcast TV Surcharge, by up to $2 per increase.

47.     By November 2015, Charter had increased the Broadcast TV Surcharge to $6.05 per month.

-12-

48.     In September 2017, Charter increased the Broadcast TV Surcharge to $7.50 per month.

49.     In February 2018, Charter increased the Broadcast TV Surcharge to $8.85 per month.

50.     In November 2018, Charter increased the Broadcast TV Surcharge to $9.95 per month.

51.     In March 2019, Charter increased the Broadcast TV Surcharge to $11.99 per month.

52.     In October 2019, Charter increased the Broadcast TV Surcharge to $13.50 per month.

53.     Charter applied these increases to the Broadcast TV Surcharge uniformly to all its customers, regardless of whether they were still within a promotional or promised flat-rate one- or two-year period. Therefore, Charter increased the total monthly amount paid by customers during promised promotional or flat-rate periods each time it increased the Broadcast TV Surcharge amount.

54.     Charter sets the Broadcast TV Surcharge at a uniform amount, nationwide, such that it knows the existing Broadcast TV Surcharge amount when a customer signs up. Despite this knowledge, Charter does not adequately disclose to prospective customers the actual amount of the Broadcast TV Surcharge then in place, and only recently buried the fact of its existence deep within its website. Charter thereby continues to mislead customers about the Surcharge's true purpose and about the fact that Charter regularly increases the Surcharge.

55.     Charter's failure to disclose the true nature of the Broadcast TV Surcharge has been the subject of congressional scrutiny. In 2016, the United States Senate's Permanent

-13-

Subcommittee on Investigations, following a hearing, requested information from Charter on its failure to properly disclose the Broadcast TV Surcharge.

56.     Charter promised Ohio Plaintiff Randall Byrne that the cable service package Charter offered him, which included the Spectrum TV Silver plan, would remain at a total monthly rate of $162.00 for at least one year. However, Charter in fact raised Byrne's monthly rate above $162.00 during the promised one-year fixed rate period, including by repeatedly increasing the Broadcast TV Surcharge.

57.     Charter promised Ohio Plaintiff David Kleuskens that the cable service package Charter offered him, which included the Spectrum TV Silver plan, would remain at a total monthly rate of $150.00 for at least one year. However, Charter in fact raised Kleuskens' monthly rate above $150.00 during the promised one-year fixed rate period including by repeatedly increasing the Broadcast TV Surcharge.

58.     Charter promised Plaintiff Jerry Henry in May 2019 a flat promotional price of approximately $150/month for his cable package including Spectrum TV Select, for at least a one-year period. However, only five months later on Henry's October 2019 bill, Charter raised Henry's monthly rate by increasing the Broadcast TV Surcharge by $1.51. Then, in December 2019, Charter advertised to Henry in a promotional flyer, and promised him via telephone, that the price for Spectrum TV under a "Seasonal Plan" (where "services hibernate while you're away") at his Ohio home would be $9.99/month while he spent the winter at his Florida residence. However, after Henry signed up for the "Seasonal Plan," Charter in fact charged Henry $23.40/month, *not* $9.99/month, for Spectrum TV during the Seasonal Plan "hibernat[ion]" period, after adding an undisclosed $13.50/month "Seasonal Broadcast TV Surcharge" to his bill.

-14-

59.     Charter promised Kentucky Plaintiff Jason Weber that the cable service package Charter offered him, which included TV service, would remain at a total monthly rate of $74.98 per month plus taxes for at least a one-year period. However, Charter in fact immediately charged an additional $9.95 in the form of the Broadcast TV Surcharge above the promised $74.98 rate, and then increased Weber's monthly rate even further by repeatedly increasing the Broadcast TV Surcharge.

60.     Not only does Charter fail to fully or accurately disclose the Broadcast TV Surcharge before consumers sign up, Charter also continues to misrepresent and obscure the Broadcast TV Surcharge after customers sign up.

61.     As alleged above, Charter's sales agents do not disclose the Broadcast TV Surcharge when quoting the monthly rate when consumers are in the process of signing up or renewing under a new promotion.

62.     On information and belief, Charter trains and instructs its sales agents to tell customers who inquire about the Broadcast TV Surcharge that it is a government fee or charge that Charter passes on to customers, even though this is not true.

63.     When Plaintiff David Kleuskens called Charter to complain about the Broadcast TV Surcharge, a Charter agent told him falsely that the Broadcast TV Surcharge was a "tax" which Charter had nothing to do with and had no control over. When Kleuskens called again to complain, a different Charter agent told Kleuskens that the Broadcast TV Surcharge was imposed by Charter because the local government charged Charter a fee for showing some channels and that Charter was simply passing on this government fee to its customers.

64.     Charter's printed bills fail to inform consumers about the true nature of the Broadcast TV Surcharge. Compounding its fraud, through at least 2018, in many cases Charter

-15-

and its predecessor Time Warner Cable falsely printed on the bill that the Broadcast TV Surcharge and the Sports Programming Surcharge were government-related fees.

65.     For example, on Plaintiff Susan Foster-Harper's January 2018 bill, Charter defined "Surcharges" as: "**Surcharges** – Spectrum, formerly TWC, imposes surcharges to recover costs of complying with its governmental obligations." Meanwhile, the <u>only</u> "surcharges" listed on the entire bill were the "Broadcast TV Surcharge" of $7.50 and the "Sports Programming Surcharge" of $2.70. Foster-Harper read that description on her bills and reasonably assumed and understood it to mean that the Broadcast TV Surcharge and the Sports Programming Surcharge were government-related pass-through charges. However, Charter's description was false; the Broadcast TV Surcharge and the Sports Programming Surcharge were *not* related to Charter's costs of complying with its governmental obligations. Rather, Charter invented and imposes the "surcharges" as a way to deceptively increase its prices, pocketing the money and enriching itself.

66.     Prior to October 2016, Charter hid the Broadcast TV Surcharge (and also the Sports Programming Surcharge) in the "Taxes, fees & surcharges" summary line on the bill, further indicating that the surcharges were government-related fees.

67.     Starting in October 2016, after Congressional scrutiny regarding the Surcharges, Charter began listing the Broadcast TV Surcharge and the Sport Programming Surcharge in an "Other Charges" section of the bill. However, Charter did *not* list the surcharges in the "TV Services" section of the bill or in the "TV Services" subtotal; Charter only listed the surcharges under "Other Charges." In many cases, Charter's bills did not provide any explanation or context for the Broadcast TV Surcharge, although the bills did provide a vague explanation for unspecified "Tax and Fees" which indicated that "This statement reflects the current taxes and

-16-

fees for your area." This "Tax and Fees" definition, which did not explicitly state to which taxes, fees, or surcharges it was referring, may have further led customers to believe the Broadcast TV "Surcharge" was one of these government-related taxes or fees.

68.    In or around 2018 or 2019, Charter began listing a new explanation of the Broadcast TV Surcharge on at least some customers' bills. The explanation reads: "The Broadcast TV Surcharge is a fee reflecting charges assessed to Spectrum by the owners of local broadcast and local 'network-affiliated' TV stations." This description is false and omits the true nature of the Broadcast TV Surcharge: in fact, the Broadcast TV Surcharge is not a fee "assessed to" Charter, but is a fee whose existence and amount is determined and charged by Charter alone. There is no equivalent fee charged by local broadcast TV stations that Charter is passing on to its customers through the Broadcast TV Surcharge. Any costs Charter pays to carry local channels are part of the inherent cost of Charter's business of providing the cable television service channels.

69.    Deep within Charter's current website, within the customer support section, Charter provides another false description of the Broadcast TV Surcharge: "As a direct result of local broadcast or 'network-affiliated' TV stations in recent years dramatically increasing the rates to Charter Communications to distribute their signals to our customers, we're *forced* to pass those charges on as a 'Broadcast TV Surcharge.' …[I]n recent years the prices demanded by local broadcast TV stations have *necessitated* that we pass these costs on to customers." (Emphases added.)[4] The terms "forced" and "necessitated" conceal the true nature of the Broadcast TV Surcharge by suggesting that Charter is required to pass through a specific fee, as if it were charged by the government like a tax or other government assessment. In fact, the Broadcast TV Surcharge is a discretionary fee whose existence and amount are determined and

---

[4] https://www.spectrum.net/support/my-account/broadcast-tv-surcharge/.

charged by Charter alone. There is no equivalent fee charged by local broadcast TV stations that Charter is passing on to its customers through the Broadcast TV Surcharge. Any costs Charter pays to carry local channels are part of the inherent cost of Charter's business of providing television services.

70.     Charter also intentionally makes it difficult for customers to know when it has increased the Broadcast TV Surcharge. First, Charter increases the Broadcast TV Surcharge in small dollar increments, e.g., $1 to $2, at a time, thereby hiding it within a bill that has other small variations month to month for items such as taxes and government fees. By increasing the Broadcast TV Surcharge multiple times each year, Charter can cumulatively increase the Surcharge over the course of a year by amounts that customers would have been more likely to notice if done all at once—such as Charter's $4.55 increase from November 2018 to October 2019. Second, even if a customer were to notice and think to inquire about a bill that was higher than usual, and the customer then went to check her or his latest bill for an explanation of the increased charges, Charter includes *absolutely no disclosure or notice whatsoever* of the increased Broadcast TV Surcharge on that latest bill. To determine the source of the increase, a customer would have to think to compare the latest bill with the prior bill. It is <u>only</u> on the prior bill—issued to customers in the middle of the prior month, fewer than 30 days before the increased charge became effective—that Charter informs customers of any increase to the Broadcast TV Surcharge.

## 2. <u>Bait & Switch Scheme 2: Pegging Discounts To, And Then Increasing, The List Price Rate</u>

71.     The second way Charter deceptively increases its monthly rate is by promising customers a specific "discounted" promotional monthly price, without disclosing that the "discount" is in fact pegged to a list price rate in the form of a dollar amount discount from that

list price rate. Charter then increases the list price rate in the middle of the supposedly fixed-rate promotional period, causing the customer's monthly "discounted" rate to increase along with it.

72.    Despite its promises to customers that they are signing up for, or renewing their service at, a flat promotional *rate*, Charter treats the promotion for billing purposes as if Charter is charging a fixed promotional dollar *discount* amount off of the standard rate. During these promotional periods, Charter has repeatedly increased its standard rate—and has increased clients' *promotional rates* in lockstep at the same time.

73.    When customers complain about such price increases in the middle of the promotional period, Charter agents justify the increases by arguing that clients' promotional *discounts* have remained the same. But this defies Charter's promises on sign-up or renewal that the promotional *rate* would remain constant, and defies Charter's pre-sale representations of a fixed promotional rate that will not increase during the promotional period.

74.    For example, in May 2019, Charter promised Plaintiff Jerry Henry a flat promotional rate of approximately $150/month for his cable package including Spectrum TV Select, for at least a one-year period. On Henry's June 18, 2019, bill, Charter printed the list price of Spectrum TV Select as $64.99, to which a $30.00 "Promotional Discount" was applied. But on Henry's October 18, 2019, bill, only five months into his "promotion," Charter printed the list price of Spectrum TV Select as $72.49 (a $7.50 increase), to which the same $30 "Promotional Discount" was applied, causing his Spectrum TV Select net "discounted" price (and the net price of his overall cable package) to *likewise* increase $7.50 despite Charter having promised Henry in June 2019 that his package price would remain the same during the promotion.

75.     Charter has thereby devised a scheme, which it fails to disclose to customers, by which Charter has pegged increases in the monthly "discounted" price to increases in the list price rate. During customers' promised fixed-rate promotional period, Charter increases the list price rate for its service and simultaneously increases the customers' promotional rates in lockstep.  Charter's application of these price increases to its customers who are still in their promotional period is deceptive, unfair, and unconscionable.

### 3.     Bait & Switch Scheme 3: Removing Channels Originally Included

76.     Charter also effectively increases its prices during a promised fixed-rate period by removing channels originally presented as part of the TV package and then telling customers they must pay additional fees if they still want those channels.

77.     When customers sign up for a Charter TV package, Charter's website lists each and every channel included with the package the customer chooses. Charter agents often explicitly state or list channels included in the service package. However, during the promised fixed-rate period, Charter has repeatedly removed promised channels from the customer's service package and then told customers they must pay extra to continue receiving those channels.

78.     Charter does not, however, decrease customers' monthly rates to account for the reduced service. In fact, Charter charges customers considerable amounts *more* (e.g., $5.99– $9.99 per channel) to access those same channels that had originally been promised and listed as part of their packages. In effect, Charter is charging more for the same service than originally quoted, despite representing that it would charge customers a fixed monthly rate for their service (which included those channels) during the one- or two-year fixed-rate service period.

-20-

79.     Charter's scheme of removing promised channels from its TV service and then telling customers they must pay extra if they still want those channels, similarly abuses any discretion purportedly granted by any Charter contract.

80.     For example, in February 2019, Charter removed the Cinemax and EPIX channels from its Spectrum TV Gold package, effective immediately, despite the fact that those channels were listed as part of the Gold package when customers signed up for it. If customers wanted to continue accessing those channels, Charter now required them to pay an additional $5.99–$9.99 for each channel per month (on top of their same TV Gold package monthly rate).

81.     For example, in February 2019, Charter removed the Cinemax channels from its Spectrum TV Silver package, effective immediately—even for Silver package customers like Plaintiffs Randall Byrne and David Kleuskens who were still within their promised fixed-rate period for the package—despite the fact that the Cinemax movie channels were promised and listed as part of the Silver package when customers signed up for it. If customers wanted to continue accessing those Cinemax channels, Charter now required them to pay an additional $9.99 per month (on top of their same TV Silver package monthly rate).

### 4.     Bait & Switch Scheme 4: Increasing Equipment Fees

82.     The fourth way Charter increases its monthly rate during a promised fixed-rate period is by increasing equipment fees, such as cable box fees, in the middle of the promised fixed-rate period. Charter regularly increases the charges for "Spectrum Receivers" (required to receive the cable TV channels) in the middle of promised fixed-rate periods.

83.     For example, in May 2019, Charter promised Plaintiff Jerry Henry a flat promotional rate of approximately $150/month for his cable package including Spectrum TV Select, for at least a one-year period. On Henry's June 18, 2019, bill, Charter listed the price of

-21-

each of his Spectrum Receivers (necessary to receive the Spectrum TV Select service) as "$7.50 each." But on Henry's October 18, 2019, bill, only five months into his "promotion," Charter raised the price of each of his Spectrum Receivers to "$7.99 each" (an increase of $0.50 for each of his 3 Spectrum Receivers) causing a $1.50 increase in his monthly price despite Charter having (falsely) promised Henry in June 2019 that his monthly service bill would remain the same during the promotional period.

C.     **Charter Intentionally Makes It Difficult for Customers to Cancel Service**

84.     Customers who learn about any of Charter's bait-and-switch schemes and are unhappy that Charter is charging them higher monthly rates than those originally quoted encounter several difficulties and challenges imposed by Charter if they try to cancel their service.

85.     First, Charter's 30-Day Money Back Guarantee explicitly *excludes* surcharges, such that if customers see the Broadcast TV Surcharge on their first bill and are dissatisfied, they cannot get it refunded even if they immediately cancel their service.

86.     Second, Charter does not currently pro-rate cancellations, such that customers are charged for the cost of the entire month even if they cancel sooner. For example, if a customer cancels his or her service on the very first day of a service month, Charter will charge the customer for the entire month, i.e., for the entire 30 days of that month, even though the customer only received service that month for a single day prior to cancelling.

87.     Third, Charter's bills do not arrive until part-way through the billing month. For example, Plaintiff Foster-Harper received her December 14, 2019 bill, which stated it was for "Services from 12/13/19 through 01/12/20," via email on December 17 (several days after the billing period had already started) and via postal mail several days after that. Thus, given

Charter's refusal to pro-rate cancellations, a customer who cancels service immediately after receiving and reviewing that month's bill is forced to pay for service for that entire month—which further discourages cancellations.

88.     Fourth, Charter has imposed a policy that customers can only cancel their service over the phone or in person, and where the cancellation must be effective *immediately* (i.e., the customer immediately loses access to all Charter services) and not on a requested future date. For example, the customer cannot designate or request that the service be cancelled effective on a future date, such as the last day of the current non-refundable billing period—which the typical customer would logically request and desire. Charter outright refuses to allow customers to place a cancellation order which is effective on a future date.

89.     Thus, if a customer, immediately upon receiving his or her monthly bill (which as a matter of Charter policy does not arrive until partway through the current billing period) calls Charter to cancel his or her service, Charter requires that: (1) the customer pay for service for the entire rest of the month (e.g., for another 2+ weeks due to Charter's no-pro-ration cancellation policy); and (2) the customer's service must be terminated *immediately*, such that the customer cannot enjoy or receive any services through the end of the month—even though Charter is *requiring* the customer to pay for services for the entire month. The only way for the customer to receive and enjoy that entire month's (paid-for) services, is for the customer to call Charter back, *again* (waiting on hold and/or going in-person to a Charter Spectrum retail store) on the very last day of the service month, and to then cancel service on that very same day.

90.     On information and belief, Charter intentionally designed these severe cancellation policies to prevent and discourage customers from cancelling their cable service.

-23-

And in fact, these Charter policies function to deter customers from cancelling their service after Charter has misled those customers about the monthly price they will be charged.

**PLAINTIFFS' FACTUAL ALLEGATIONS**

**Plaintiff Randall Byrne**

91.     Plaintiff Randall Byrne is, and at all relevant times has been, an Ohio resident.

92.     Byrne was previously a subscriber of Time Warner Cable's television and broadband internet cable service at his home in Ohio for many years. After Charter Communications, Inc. acquired Time Warner Cable in mid-2016, the branding on the monthly bills he received changed from "Time Warner Cable" to Charter's "Spectrum." Byrne continues to be a subscriber of Charter's cable television service as of the filing of this complaint.

93.     In 2018, Byrne noticed that his cable bill significantly increased. Byrne called Charter customer service to complain about the large and unexpected increase. The agent he spoke to told him his rate had increased because the "promo" he was on expired. Byrne asked the agent how he could reduce his monthly bill. The agent told Byrne he could sign up for a new cable bundle which included the Spectrum TV Silver plan and broadband internet at a total monthly rate of approximately $162.00. The Spectrum TV Silver plan included the Cinemax movie channels. The agent told Byrne that the cable package was <u>not</u> a short-term promotional package and promised that the monthly rate "would not change" for at least a year. The agent did not inform Byrne of the existence of the Broadcast TV Surcharge or explain what the charge was. Based on the Charter agent's promises and representations to him, Byrne signed up for the cable service bundle.

94.     On or around November 2018, Byrne's cable bill increased when Charter increased the Broadcast TV Surcharge by $1.10, to $9.95. Byrne did not receive full, fully accurate, or non-misleading notice that the Broadcast TV Surcharge would be increased or

-24-

regarding the nature or basis of the Broadcast TV Surcharge. Byrne did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its cable television service packages.

95.    After noticing that his November 2018 cable bill was higher than promised, Byrne examined his full printed cable bill and compared it to the printed bills from prior months to determine the source of the price increase. Until he examined those bills, Byrne had no idea about the existence of the Broadcast TV Surcharge. Based on the name and presentation of the Broadcast TV Surcharge on the bills, Byrne believed that the Broadcast TV Surcharge was a pass-through cost that Charter was required to charge, like a tax.

96.    On or around February 2019, Byrne attempted to access a Cinemax movie channel included in his TV plan, and discovered he was no longer able to access the Cinemax channels. Starting in February 2019, Charter had removed the Cinemax channels from his Spectrum TV Silver plan, and Charter now demanded that Byrne pay an additional $9.99 per month to continue accessing those channels. Since February 2019, and continuing today, Charter has charged Byrne for his Spectrum TV Silver plan without any reduction to account for the removed Cinemax channels.

97.    On or around March 2019, Byrne's cable bill increased when Charter raised the Broadcast TV Surcharge by $2.04, to $11.99. Byrne did not receive full or adequate notice that the Broadcast TV Surcharge would be increased or regarding the nature or basis of the Broadcast TV Surcharge. Byrne did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its cable television service packages.

98.     On or around October 2019, Byrne's cable bill increased when Charter raised the Broadcast TV Surcharge by $1.51 to $13.50. Byrne did not receive full or adequate notice that the Broadcast TV Surcharge would be increased or regarding the nature or basis of the Broadcast TV Surcharge. Byrne did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its cable television service packages.

99.     Byrne remains a Charter customer. Charter, and its predecessor Time Warner Cable, charged Byrne the Broadcast TV Surcharge for many years. Charter continues to charge Byrne the Broadcast TV Surcharge to this day.

100.    Through the imposition and increase of the Broadcast TV Surcharge, Charter has for several years charged Byrne a higher price for his cable services each month than Charter promised him and he expected to pay, causing him damages. Through the removal of his Cinemax channels which Charter had previously promised were included in his Spectrum TV Silver plan, Charter has effectively increased his rates for the remaining channels he still receives, causing him damages.

101.    When Byrne agreed in 2018 to purchase his cable service package which included the Spectrum TV Silver plan, he was relying on Charter's explicit representations regarding the monthly price of the services and the channels which were included in the TV plan. He did not expect (and Charter did not tell him) that Charter would charge a bogus so-called Broadcast TV Surcharge which Charter could and would increase at its whim. When Byrne agreed to purchase his cable package in 2018, he was relying on Charter's explicit representations that the price of the cable package would remain the same for at least a year, and that the channel lineup promised to him, including Cinemax, would likewise remain the same. He did not expect (and

Charter did not tell him) that Charter would increase the price of the cable package or remove the Cinemax channels from his service at Charter's whim. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his service and would have acted differently.

**Plaintiff David Kleuskens**

102.     Plaintiff David Kleuskens is, and at all relevant times has been, an Ohio resident.

103.     Kleuskens has been a subscriber of Charter's cable television service since mid-2018, and continues to be a subscriber as of the filing of this complaint.

104.     In mid-2018, Kleuskens went to a Charter Spectrum retail store to learn about Spectrum's service plans and prices. A Charter agent at the store told Kleuskens that the cost for a cable service bundle of the Spectrum Silver TV plan, broadband internet, and phone service was a flat price of approximately $128.00 per month, and that three receivers for his televisions would be another $7.50 each, for a monthly total of approximately $150.00. Kleuskens told the agent that it was very important to him that this monthly price remain the same and not constantly increase, and that otherwise he was not interested in subscribing to Charter. The agent promised Kleuskens that the price for the service bundle would remain approximately $150.00 per month for at least a year. At that time, the advertised and promised channel lineup for the Silver TV package included the Cinemax movie channels. The agent did not inform Kleuskens of the existence of the Broadcast TV Surcharge or explain what the charge was. Based on the Charter agent's promises and representations to him, Kleuskens signed up for the cable service bundle.

105.     On or around November 2018, Kleuskens' cable bill increased when Charter raised the Broadcast TV Surcharge by $1.10, to $9.95. Kleuskens did not receive full or accurate

notice that the Broadcast TV Surcharge would be increased or regarding the nature or basis of the Broadcast TV Surcharge. Kleuskens did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its cable television service packages.

106.    Kleuskens called Charter to complain about the price increase. The Charter agent blamed the increase on the Broadcast TV Surcharge, and falsely told Kleuskens that the Broadcast TV Surcharge was a "tax" which Charter had nothing to do with and over which Charter had no control.

107.    On or around February 2019, Kleuskens' bill increased again when Charter raised the Broadcast TV Surcharge by $2.04, to $11.99. Kleuskens called Charter to complain about the price increase. The Charter agent Kleuskens spoke to falsely told Kleuskens that the Broadcast TV Surcharge was imposed by Charter because the local government charged Charter a fee for showing some channels, and that Charter was simply passing this government fee on to its customers via the Broadcast TV Surcharge.

108.    In protest against Charter's repeated increase of his bill via the Broadcast TV Surcharge in violation of Charter's promises and representations to him, for several months Kleuskens deducted the amount of the latest Broadcast TV Surcharge increase (approximately $2.04 per month) from the amount he paid Charter for each bill. After a few months, Charter sent a letter to Kleuskens warning him that unless he paid the full balance of his bill (including the past Broadcast TV Surcharge increases), Charter would cut off his services. Faced with this threat, Kleuskens paid the full balance claimed by Charter.

109.    Also on or around February 2019, Charter removed the Cinemax movie channels from Kleuskens' Spectrum TV Silver plan, despite the fact that those channels were listed as part

of the TV Silver plan when he signed up for it and despite the fact that he was still within the promised fixed-rate period. In order to continue accessing those channels, Charter now required Kleuskens to pay an additional $9.99 per month (on top of his TV Silver plan monthly rate). Since February 2019, and continuing today, Charter has charged Kleuskens for his Spectrum TV Silver plan without any reduction to account for the removed Cinemax channels.

110.     On or around October 2019, Kleuskens' bill increased again. Charter had raised the Broadcast TV Surcharge, this time by $1.51 to $13.50. Charter had also raised the price of his two Spectrum Receivers (the cable boxes required to receive the television channels) by $0.50 each, increasing his bill by another $1.00 per month. Kleuskens called Charter to complain about the increase and spoke to a Charter agent. The agent told Kleuskens there was nothing the agent or Charter could do, and the agent refused to credit his account for the increase.

111.     Kleuskens remains a Charter customer. Charter has charged Kleuskens the Broadcast TV Surcharge every month since he signed up for Charter in mid-2018, and continues to do so to this day.

112.     Through the imposition and increase of the Broadcast TV Surcharge, Charter has charged Kleuskens a higher price for his cable services each month than Charter promised him and he expected to pay, causing him damages. Through the removal of the Cinemax channels which Charter had previously represented were included in Kleuskens' Spectrum TV Silver plan, Charter has effectively increased his rates for the remaining channels he still receives, causing him damages.

113.     When Kleuskens signed up for Charter cable services in 2018, he was relying on Charter's explicit representations regarding the monthly price of the services. He did not expect (and Charter did not tell him) that Charter would charge a bogus so-called Broadcast TV

Surcharge which Charter could and would increase at its whim. He did not expect (and Charter did not tell him) that Charter would remove channels from his Spectrum TV Silver plan and then require him to pay extra to continue accessing those channels. That information would have been material to him. Had Kleuskens known that information, he would not have been willing to pay as much for his service and would have acted differently.

**Plaintiff Jerry Henry**

114.    Plaintiff Jerry Henry is a Florida resident who typically resides in Ohio during the May through October months each year.

115.    Henry was previously a subscriber of Time Warner Cable's television and broadband internet cable service at his Ohio home, having first signed up for Time Warner Cable in or around 2016. After Charter Communications, Inc. acquired Time Warner Cable, the branding on the monthly bills he received changed from "Time Warner Cable" to Charter's "Spectrum." Henry continued to be a subscriber of Charter's cable service until May 2020, when he cancelled his service.

116.    In May 2019, Henry noticed that his cable bill significantly increased. Henry called Charter customer service to complain about the large and unexpected increase. The agent he spoke to told him his rate had increased because the legacy Time Warner Cable "promo" he was on expired.

117.    Henry made multiple calls to multiple agents in an effort to reduce his bill. One agent he spoke to told Henry he could sign up for a new Charter Spectrum cable bundle promotion which included the Spectrum TV Select plan, broadband internet and voice at a total monthly rate of approximately $150.00. The agent told Henry that the promotional $150.00 price was a flat rate which would not change for at least a year. The agent did not inform Henry of the existence of the Broadcast TV Surcharge or explain what the charge was. The agent also did not

-30-

inform Henry of any installation or setup charges. Based on the Charter agent's promises and representations to him, Henry signed up in May 2019 for the cable service bundle at the promised $150.00 rate for his Ohio home.

118.    In or around late May 2019, new cable boxes, which he had not requested or expected, showed up on his doorstep. Henry installed the new equipment himself. Henry was then surprised to see a $9.99 "Self-Install Activation Charge" on his June 18, 2019 bill. When Henry called Charter to complain about the self-install charge, he told the Charter customer service agent that if Charter had bought out Time Warner Cable and new equipment was needed, they should have installed it at no cost and should not charge him a self-install fee for the change-over. The Charter agent refused to refund the self-install charge and unapologetically told Henry he could have been charged a lot more, because Charter would have charged him a much higher installation fee if a Charter technician had come to install the equipment.

119.    For the first four months through September 2019, Charter billed Henry at the promised rate of approximately $150.00 per month, with the exception of the $9.99 self-install charge.

120.    But on Henry's October 2019 bill, in the fifth month of his promised fixed-rate promotional period, Charter increased his monthly rate significantly via three of the deceptive practices that are the subject of this complaint. First, Charter raised Henry's monthly rate by increasing the Broadcast TV Surcharge by $1.51. Second, Charter increased the price of his Spectrum TV Select package by $7.50, by increasing the list price of Spectrum TV Select from $64.99 to $72.49 while applying the same $30 flat "Promotional Discount" amount to the now higher list price rate. Third, Charter increased his bill by another $1.50 by raising the price of each of his Spectrum Receivers to "$7.99 each" (an increase of $0.50 per cable box).

-31-

121.    Henry did not receive full, fully accurate, or non-misleading notice of these price increases, which occurred in the middle of his promised fixed-rate promotion. Henry did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its cable television service packages.

122.    In late 2019, Henry received a promotional flyer in the mail from Charter in which Charter advertised its "Seasonal Plan." The flyer advertised: "PLANNING A TEMPORARY MOVE? Switch to a Spectrum Seasonal Plan and enjoy a worry-free transition when you're away from home." The flyer also stated "MOVING FOR THE SEASON? … Let your TV, Internet or Voice services hibernate while you're away."

123.    The flyer advertised that the rates for the "Seasonal Plan" were $9.99/month for television, $4.99/month for internet, and $4.99/month for voice. The flyer contained no disclosure, not even in the tiny fine print on the back of the flyer, that there would be an additional $13.50/month Broadcast TV Surcharge on top of the $9.99/month television charge.

124.    Henry was already planning on residing in his home in Florida through April 2020. Henry had subscribed to seasonal plans in the past, and this advertised Seasonal Plan was attractive to him because he would pay a much lower rate of approximately $20.00 per month to Charter while he was in Florida, and meanwhile would avoid the hassle and costs of disconnecting, reconnecting, and reinstalling his services at his Ohio home.

125.    In response to the Spectrum Seasonal Plan flyer, Henry called Charter in December 2019 and spoke to a Charter agent about signing up for the Seasonal Plan. The agent confirmed that the monthly rate for the Seasonal Plan would be approximately $20.00 per month "plus taxes" (i.e., $9.99/month for television, $4.99/month for internet, and $4.99/month for voice, plus taxes). The agent did not inform Henry that there would be a $13.50 Broadcast TV

Surcharge on top of the $9.99/month television charge. Based on Charter's and the agent's representations, Henry signed up for the Seasonal Plan, to be effective January 1, 2020.

126.     When Henry received his January 18, 2020 bill, he was surprised to see an additional $13.50 "Seasonal Broadcast TV Surcharge" under the "Other Charges" section of his bill. Henry called Charter to complain, and told the Charter agent that neither the flyer he saw, nor the agent he had spoken to in December, had disclosed to him that Charter would bill him an additional $13.50 "Seasonal Broadcast TV Surcharge" above the advertised $9.99/month Seasonal Plan television rate. The agent refused to refund or remove the Seasonal Broadcast TV Surcharge, and told Henry that it was a required charge "that the government allows the cable companies to pass on." On January 25, 2020, Henry filed an online complaint on the FCC website complaining that Charter failed to disclose the additional $13.50 Seasonal Broadcast TV Surcharge to him including in the promotional Seasonal Plan flyer.

127.     Charter charged Henry the Broadcast TV Surcharge every month since he first signed up in 2016, through May 2020. In May 2020 Henry cancelled his Charter service.

128.     Through the imposition and increase of the Broadcast TV Surcharge, by increasing his Spectrum TV Select plan "discounted" rate, and by increasing the monthly cost of his three cable boxes required to receive cable television, Charter charged Henry a higher price for his cable services than Charter promised him and he expected to pay, causing him damages.

129.     When Henry agreed in May 2019 to purchase his cable service package which included the Spectrum TV Select plan, he was relying on Charter's explicit representations regarding the fixed monthly price of the services. When Henry later agreed in December 2019 to temporarily switch over to the Seasonal Plan while he was away in Florida, he did not expect (and Charter did not tell him) that Charter would charge him a $13.50 Seasonal Broadcast TV

Surcharge on top of the advertised and promised $9.99/month television charge. Henry did not expect (and Charter did not tell him) that Charter would increase the price of his services via these various schemes given Charter's omissions and representations to the contrary. This information would have been material to him. Had Henry known this information he would not have been willing to pay as much for his services and would have acted differently.

**Plaintiff Jason Weber**

130.    Plaintiff Jason Weber is, and at all relevant times has been, a Kentucky resident.

131.    Weber was a subscriber of Charter's cable television service from November 2018 through January 2020.

132.    As of October 2018, Weber subscribed to an internet-only plan from Charter at a rate of $19.99 per month. The plan, called the Everyday Low Price Internet package ("ELP"), was a legacy broadband internet plan previously offered by Time Warner Cable prior to its acquisition by Charter. Weber noticed that Charter recently had significantly reduced the internet speed of the plan. Then, on or about November 2018, Charter increased the price of this now slower ELP internet plan by $5.00 to $24.99.

133.    On or about November 2018, Weber called Charter to inquire about Charter's service offerings for faster internet. The Charter agent he spoke to encouraged him to sign up for a services bundle which included Charter's live TV streaming plan. Based on the options and prices offered by the Charter agent he spoke to, Weber determined that the price for a bundle of both faster internet *and* TV streaming was between $10 and $20 more than the price for faster internet alone. The Charter agent offered Weber a broadband internet plus TV streaming bundle plan called "Spectrum Lifestyle" for a flat price of $74.98 per month "plus taxes." Weber told the agent he was not interested in a temporary "promo" rate where the price was going to jump

up after some initial promotional period. The agent promised him that the $74.98 rate was <u>not</u> a promotional rate and that the $74.98 rate, plus tax, would not increase for at least a year. The agent did not inform Weber of the existence of the Broadcast TV Surcharge or explain what the charge was. Based on the Charter agent's promises and representations to him, Weber signed up for the service bundle.

134.    When Weber received his first bills, he was surprised that the total monthly bill was over $12.00 more than the quoted $74.98 rate. Weber saw that the $9.95 so-called Broadcast TV Surcharge comprised most of that amount. Based on the name and presentation of the Broadcast TV Surcharge on the bill, and based on the agent's promise to him that the total monthly price would be $74.98 "plus tax," Weber believed that the Broadcast TV Surcharge was a pass-through cost that Charter was required to charge, such as a tax or government-related fee.

135.    On or around February 2019, Weber's bill increased when Charter raised the Broadcast TV Surcharge by $2.04, to $11.99. Weber did not receive full or accurate notice that the Broadcast TV Surcharge would be increased or regarding the nature or basis of the Broadcast TV Surcharge. Weber did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its television service.

136.    On or around October 2019, Weber's bill increased again when Charter raised the Broadcast TV Surcharge, this time by $1.51 to $13.50. Weber did not receive full or accurate notice that the Broadcast TV Surcharge would be increased or regarding the nature or basis of the Broadcast TV Surcharge. Weber did not then know, nor could he then know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its television service.

137.    Charter charged Weber the Broadcast TV Surcharge every month from November 2018 through January 2020; in January 2020 Web cancelled his Charter service.

138.    Through the imposition and increase of the Broadcast TV Surcharge, Charter charged Weber a higher price for his cable services each month than Charter promised him and he expected to pay, causing him damages.

139.    When Weber signed up for his Charter broadband internet and TV streaming bundle in November 2018, he was relying on Charter's explicit representations regarding the monthly price of the services. He did not expect (and Charter did not tell him) that Charter would charge and increase a bogus so-called Broadcast TV Surcharge on top of the promised service price or that the true price of the services would include an additional Broadcast TV Surcharge which Charter could and would increase at its whim. That information would have been material to him. Had Weber known that information, he would not have been willing to pay as much for his service and would have acted differently.

**Plaintiff Susan Foster-Harper**

140.    Plaintiff Susan Foster-Harper is, and at all relevant times has been, a Kentucky resident.

141.    Foster-Harper was previously a subscriber of Time Warner Cable's television and broadband internet cable service at her residence in Kentucky. After Charter Communications, Inc. acquired Time Warner Cable in mid-2016, the branding on the monthly bills she received changed from "Time Warner Cable" to Charter's "Spectrum." Foster-Harper continues to be a subscriber of Charter's cable internet and TV service as of the filing of this complaint, with a "legacy" Time Warner Cable cable plan.

142.    In September 2017, Charter increased Foster-Harper's bill by raising the Broadcast TV Surcharge from $6.05 to $7.50 per month.

143.    In February 2018, Charter increased her bill by raising the Broadcast TV Surcharge from $7.50 to $8.85 per month.

144.    In November 2018, Charter increased her bill by raising the Broadcast TV Surcharge from $8.85 to $9.95 per month.

145.    In March 2019, Charter increased her bill by raising the Broadcast TV Surcharge from $9.95 per month to $11.99 per month.

146.    In October 2019, Charter increased her bill by increasing the Broadcast TV Surcharge from $11.99 to $13.50 per month.

147.    Since at least January 2017, Charter has also charged Foster-Harper $2.70 per month for a "Sports Programming Surcharge."

148.    When Foster-Harper signed up for her Time Warner Cable legacy plan, and whenever Foster-Harper made any changes to that plan, Charter's predecessor Time Warner Cable did not inform Foster-Harper of the existence of the Broadcast TV Surcharge or the Sports Programming Surcharge.

149.    Foster-Harper never received full, fully accurate, or non-misleading notice from either Time Warner Cable or its successor Charter of what the Broadcast TV Surcharge or the Sports Programming Surcharge are or their nature or basis. Foster-Harper never received full, fully accurate, or non-misleading notice that the Broadcast TV Surcharge would be increased. When Time Warner Cable and Charter imposed, and each time either increased, the Broadcast TV Surcharge and Sports Programming Surcharge, Foster-Harper did not know, nor could she

know, that the Broadcast TV Surcharge was really just part of a scheme for Charter to raise the monthly rate of its television service packages.

150.     Foster-Harper reasonably believed, based on Time Warner Cable's and its successor Charter's representations on her monthly bills since at least 2016, that the Broadcast TV Surcharge and the Sports Programming Surcharge were government-related fees. For example, on Foster-Harper's January 2018 bill Charter defined "Surcharges" as: "**Surcharges** – Spectrum, formerly TWC, imposes surcharges to recover costs of complying with its governmental obligations."  Meanwhile, the <u>only</u> "surcharges" listed on the entire bill were the "Broadcast TV Surcharge" of $7.50 and the "Sports Programming Surcharge" of $2.70. Foster-Harper read this description on her bills and reasonably assumed and understood it to mean that the Broadcast TV Surcharge and the Sports Programming Surcharge were government-related pass-through charges.

151.     Foster-Harper remains a Charter customer. Charter, and its predecessor Time Warner Cable, charged Foster-Harper the Broadcast TV Surcharge since 2010 and the Sports Programming Surcharge since 2015. Charter continues to charge Byrne the Broadcast TV Surcharge to this day.

152.     Through the imposition and increase of the Broadcast TV Surcharge, and the imposition of the Sports Programming Surcharge, Charter has for many years charged Foster-Harper a higher price for her cable services each month than Charter promised her and she expected to pay, causing her damages.

153.     Contrary to Charter's representations, the Broadcast TV Surcharge and the Sports Programming Surcharge were *not* related to Charter's costs of complying with its governmental

obligations. Rather, Charter invented and imposes the "surcharges" as a way to deceptively

increase its prices, pocketing the money and enriching itself.

154.    This information would have been material to her. Had Foster-Harper known this

information, she would not have been willing to pay as much for her service and would have

acted differently.

## **CLASS ALLEGATIONS**

155.    Plaintiffs bring this lawsuit on behalf of themselves and all others similarly

situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

156.    Plaintiffs Randall Byrne, David Kleuskens, and Jerry Henry seek to represent the

following "Ohio Class":

> All persons who, within the applicable statute of limitations period, if any,
> purchased television service from Charter and resided or received Charter
> television service in Ohio.

157.    Plaintiffs Jason Weber and Susan Foster-Harper seek to represent the following

"Kentucky Class":

> All persons who, within the applicable statute of limitations period, if any,
> purchased television service from Charter and resided or received Charter
> television service in Kentucky.

158.    Excluded from the three Classes above are Charter and any entities in which

Charter has a controlling interest, their officers, directors, employees, and agents, the judge to

whom this case is assigned, members of the judge's staff, and the judge's immediate family.

159.    **Numerosity.** The members of the Classes are each so numerous that joinder of all

members would be impracticable. While Plaintiffs do not know the exact number of members of

each Class prior to discovery, upon information and belief, there are many thousands of members

in each Class.

160.    **Commonality and Predominance.** This action involves multiple common questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a.      Whether it was deceptive or unfair for Charter not to disclose the Broadcast TV Surcharge, its dollar amount, or the fact that Charter could choose to raise its amount at any time, as part of the advertised and quoted price of its television services;

b.      Whether the Broadcast TV Surcharge, the fact that Charter could choose to raise it at any time, and the true price of Charter's television services are material information, such that a reasonable consumer would find that information important to their purchase decision;

c.      Whether it was deceptive or unfair for Charter to peg customer discounts to a list price rate, increase that list price rate, and increase the customer's "discounted" rate with it during a promised fixed-rate period;

d.      Whether the fact that Charter pegged customer discounts to a list price rate and increased that list price rate and the customer's "discounted" rate along with it during a promised fixed-rate period is material information important to the customer's purchase decision;

e.      Whether it was deceptive or unfair for Charter to remove promised channels from customer television service packages during the promised fixed-rate period, and to then charge extra to retain access to those channels;

f.      Whether it was deceptive or unfair for Charter to increase during the promised fixed-rate period the monthly price of customer equipment such as cable boxes which

-40-

were utilized by customers to receive television service;

g.    Whether a reasonable consumer is likely to be deceived by Charter's conduct and omissions alleged herein;

h.    Whether Charter's description of the Broadcast TV Surcharge is false and/or misleading;

i.    Whether Charter's misrepresentations and omissions alleged herein constitute fraudulent concealment under the laws of Ohio and Kentucky.

j.    Whether Charter has violated the implied covenant of good faith and fair dealing, implied in its contracts with its Plaintiffs and the Classes, by imposing and increasing the Broadcast TV Surcharge, or by engaging in the other tactics alleged in this Complaint by which Charter increases customers' monthly rates or reduces its promised services during a promised fixed-rate period; and

k.    Whether Charter's retention of the monies paid by Plaintiffs and the Class Members constitutes unjust enrichment under the laws of Ohio and Kentucky.

161.    **Typicality**. Plaintiffs, like all Class Members, are current or former Ohio and Kentucky subscribers of Charter television service plans who have been charged higher monthly rates than quoted at the time of subscription. Their claims all arise from the same course of conduct by Charter and are based on the same legal theories. Plaintiffs' claims are typical of all Class members' claims.

162.    **Adequacy**. Plaintiffs and their counsel will adequately protect the Classes' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Classes. Moreover, Plaintiffs have retained counsel who are highly experienced in prosecuting complex class action and consumer protection cases.

163.   **Superiority.** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of their claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Charter's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the judicial system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial in this case.

164.   By its conduct and omissions alleged in this Complaint, Charter has acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and/or declaratory relief is appropriate respecting the Classes as a whole.

165.   Charter fraudulently concealed the facts underlying the causes of action pled here, intentionally failing to disclose the true cost of its services and in order to deceive Plaintiffs and the proposed Class Members, despite its duty to make such disclosure. The nature of Charter's misconduct was non-obvious and/or was obscured from public view, and neither Plaintiffs nor the members of the Classes could have, through the use of reasonable diligence, learned of the accrual of their claims against Charter at an earlier time. This Court should, at the appropriate time, apply the discovery rule (or any other applicable doctrines) to extend and/or toll any applicable limitations period (and the corresponding class period) to the date on which Plaintiffs first reasonably should have known of the existence of the causes of action pled here.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Ohio Consumer Sales Practices Act
### Ohio Rev. Code Ann. § 1345.01, *et seq.*
### (On Behalf of the Ohio Class)

166.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

167.    The Ohio Consumer Sales Practices Act (Ohio Rev. Code. Ann. § 1345.01, *et seq.*) ("Ohio CSPA") states that: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code. Ann. § 1345.02(A). The Ohio CSPA further prohibits "an unconscionable act or practice in connection with a consumer transaction." Ohio Rev. Code. Ann. § 1345.03.

168.    Plaintiffs Randall Byrne, David Kleuskens and Jerry Henry and the proposed Ohio Class members, and Defendants are "persons" within the meaning of Ohio Rev. Code. Ann. § 1345.01(B). Defendants are also "suppliers" within the meaning of Ohio Rev. Code. Ann. § 1345.01(C). Plaintiffs Byrne, Kleuskens and Henry and the proposed Ohio Class members are "consumers" within the meaning of Ohio Rev. Code. Ann. § 1345.01(D), and their purchases of Defendants' cable television services are "consumer transactions" within the meaning of Ohio Rev. Code. Ann. § 1345.01(A).

169.    Defendants engaged in unfair, deceptive, and unconscionable practices that violated the Ohio CSPA. As set forth in detail above, Defendants made statements and omitted material information that had and continue to have the capacity to deceive the public and caused injury to Plaintiffs Byrne, Kleuskens and Henry and proposed Ohio Class members.

170.     Defendants' representations and affirmations of fact made by Defendants, and the facts they concealed or failed to disclose, are material facts that were likely to deceive reasonable consumers.

171.     Defendants intended for consumers, including Plaintiffs Byrne, Kleuskens and Henry and proposed Ohio Class members, to rely on these material misrepresentations and nondisclosures.

172.     In addition to being deceptive, Defendants' misrepresentations, active concealment, and failures to disclose material information regarding the true monthly cost of their services were also unfair and unconscionable. Defendants took advantage of the inability of the Plaintiffs Byrne, Kleuskens and Henry and the proposed Ohio Class members to reasonably protect their interests by misleading them about the true cost of their services, which Defendants concealed and failed to disclose.

173.     Defendants' conduct directly and proximately caused injury to consumers, including Plaintiffs Byrne, Kleuskens and Henry and proposed Ohio Class members, which they could not avoid because of Defendants' concealment. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefits to consumers or competition. There is a strong public interest in truth in advertising. Defendants' conduct was also contrary to legislatively declared public policy, including the Ohio CSPA.

174.     Pursuant Ohio Rev. Code Ann. § 1345.09, Plaintiffs Byrne, Kleuskens and Henry and the proposed Ohio Class members seek an order enjoining Defendants' unfair, deceptive, and unconscionable acts or practices, and awarding damages, attorneys' fees, and any other just and proper relief available under the Ohio CSPA.

-44-

**COUNT II**
**Violation of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. Ann. § 367.110, *et seq.***
**(On Behalf of the Kentucky Class)**

175.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

176.    The Kentucky Consumer Protection Act (Ky. Rev. Stat. Ann. § 367.110, *et seq.*) ("Kentucky CPA") states:

> Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Ky. Rev. Stat. Ann. § 367.170(1). Under the Kentucky CPA, "unfair" is construed to mean "unconscionable." Ky. Rev. Stat. Ann. § 367.170(2).

177.    Plaintiffs Jason Weber and Susan Foster-Harper, the proposed Kentucky Class members, and Defendants are "persons" within the meaning of Ky. Rev. Stat. 367110(1). Defendants' sale of the cable television services constitutes "trade" and "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

178.    Defendants engaged in unfair, deceptive, and unconscionable practices that violated the Kentucky CPA. As set forth in detail above, Defendants made statements and omitted material information that had and continue to have the capacity to deceive the public and caused injury to Plaintiffs Weber and Foster-Harper and proposed Kentucky Class members.

179.    Defendants' representations and affirmations of fact made by Defendants, and the facts they concealed or failed to disclose, are material facts that were likely to deceive reasonable consumers.

180.    Defendants intended for consumers, including Plaintiffs Weber and Foster-Harper and proposed Kentucky Class members, to rely on these material misrepresentations and nondisclosures.

-45-

181.    In addition to being deceptive, Defendants' misrepresentations, active concealment, and failures to disclose material information regarding the true monthly cost of their services were also unfair and unconscionable. Defendants took advantage of the inability of the Plaintiffs Weber and Foster-Harper and the proposed Kentucky Class members to reasonably protect their interests by misleading them about the true cost of their services, which Defendants concealed and failed to disclose.

182.    Defendants' conduct directly and proximately caused injury to consumers including Plaintiffs Weber and Foster-Harper and proposed Kentucky Class members, which they could not avoid because of Defendants' concealment. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefits to consumers or competition. There is a strong public interest in truth in advertising. Defendants' conduct was also contrary to legislatively declared public policy, including the Kentucky CPA.

183.    Pursuant Ky. Rev. Stat. Ann. § 367.220, Plaintiffs Weber and Foster-Harper and the proposed Kentucky Class members seek an order enjoining Defendants' unfair, deceptive, and unconscionable acts or practices, and awarding damages, attorney's fees, and any other just and proper relief available under the Kentucky CPA.

**COUNT III**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of all Classes, and in the alternative to Count IV)**

184.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

185.    Plaintiffs allege this cause of action in the alternative to Count IV.

186.    To the extent any applicable contract could be read as granting Defendants discretion to impose and/or increase the monthly price charged to its customers above the price promised and quoted for a promotional fixed rate period—which Plaintiffs do not concede—that

1992930.3

discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by applicable state law.

187.     Defendants have violated the covenant of good faith and fair dealing by their conduct alleged herein.

188.     Defendants have abused any discretion they purportedly had under any applicable contract to raise the monthly price for Charter's cable television services higher than that quoted. Based on counsel's investigation, Charter uses the Broadcast TV Surcharge as a covert way to increase customers' monthly rates without having to advertise such higher rates. Charter's scheme of pegging customers' television service price to a list price rate, increasing that list price rate, and then increasing the customers' "discounted" rates during the promised fixed-rate period along with it, similarly abuses any discretion purportedly granted by any Charter contract. Likewise, Charter's schemes of (a) removing and then charging extra for channels originally presented as part of the package, and (b) increasing equipment charges during the promised fixed-rate period, abuse any discretion purportedly granted by any Charter contract.

189.     Defendants' bait-and-switch schemes defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Defendants' conduct alleged herein was arbitrary and in bad faith.

190.     Defendants' conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Class members the full benefit of their bargains with Charter.

191.     Plaintiffs and the Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Defendants.  There is no legitimate excuse or defense for Defendants' conduct.

-47-

192.    Any attempts by Charter to defend its overcharging through reliance on contractual provisions will be without merit. Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Charter's misconduct, among other reasons. Any such provisions, if any, would not excuse Charter's abuses of discretion or otherwise preclude Plaintiffs and the Classes from recovering for breaches of the covenant of good faith and fair dealing.

193.    Plaintiffs and members of the Classes sustained damages as a result of Defendants' breaches of the covenant of good faith and fair dealing.  Plaintiffs seek damages in an amount to be proven at trial.

## COUNT IV
## Unjust Enrichment
### (On Behalf of all Classes, and in the alternative to Count III)

194.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

195.    Plaintiffs allege this cause of action in the alternative to Count III.

196.    Plaintiffs and the other members of each of the proposed Classes conferred benefits on Defendants by signing up and paying for Defendants' cable television services.

197.    Defendants received the benefits to the detriment of Plaintiffs and the other members of each of the proposed Classes because Plaintiffs and the other Class members paid a higher monthly cost than advertised and represented to them before and during sign-up and/or renewal, which is not what they bargained for.

198.    Defendants have been unjustly enriched in retaining the revenues derived from the monthly amounts paid by Plaintiffs and the other members of each of the proposed Classes.

-48-

Retention of those monies under these circumstances is unjust and inequitable because Defendants' representations and omissions were misleading to consumers, which caused injuries to Plaintiffs and the other Class members.

199.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the other members of the each of the proposed Classes is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the other Class members for their unjust enrichment.

## PRAYER FOR RELIEF

200.    On behalf of themselves and the proposed Classes, Plaintiffs request that the Court order relief and enter judgment against Charter as follows:

a.    Declare this action to be a proper class action, certify the proposed Classes, and appoint Plaintiffs and their counsel to represent the respective Classes;

b.    Order Charter to match its marketing and price quotes before and during sign-up or renewal with its actual rates, including by ordering Charter to: (1) either stop charging the Broadcast TV Surcharge or clearly disclose it as part of the quoted monthly price in advertisements, phone sign-up, in-store sign-up, and online sign-up; (2) stop removing channels previously offered as part of the package for a fixed-rate period and then requiring customers to pay an additional amount to retain or keep those channels during that period; and (3) stop increasing the price for customers' monthly service in the middle of a promised fixed-rate promotional or renewal period, including by increasing the Broadcast TV Surcharge, increasing television service plan "discounted" rates which are pegged to parallel increases in the list price rates, and by increasing the monthly price of customer equipment such as cable boxes which are utilized by customers to receive television service.

       c.      Order Charter to engage an independent person, group, or organization to conduct an internal assessment to (1) identify the root causes of the decisions that led Charter to misrepresent its actual rates, (2) identify corrective actions and institutional culture changes to address these root causes, and (3) help Charter implement and track those corrective actions to ensure Charter does not engage in such misrepresentations again.

       d.      Order Charter to pay damages and restitution to Plaintiffs and the Classes in amounts to be proven at trial;

       e.      Order Charter to pay attorneys' fees, costs, and pre-judgment and post-judgment interest;

       f.      Retain jurisdiction to monitor Charter's compliance with the injunctive relief; and

       g.      Provide all other relief to which Plaintiffs and the Class may show themselves justly entitled.

## DEMAND FOR JURY TRIAL

201.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 21, 2020

By: _/s/ Hugh W. Cuthbertson_____

ZANGARI COHN CUTHBERTSON
DUHL & GRELLO P.C.
Hugh W. Cuthbertson (CT #04133)
hcuthbertson@zcclawfirm.com
Steve C Rickman (CT #19442)
srickman@zcclawfirm.com
59 Elm Street, Suite 400
New Haven, CT 06510
(203) 789-0001
(203) 782-2766 (fax)

Respectfully submitted,

By: _/s/ Michael W. Sobol_____

LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
Michael W. Sobol*
msobol@lchb.com
Roger N. Heller*
rheller@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000
(415) 956-1008 (fax)

LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
Daniel E. Seltz*
dseltz@lchb.com
Avery S. Halfon*
ahalfon@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500
(212) 355-9592 (fax)

HATTIS & LUKACS
Daniel M. Hattis*
dan@hattislaw.com
Paul Karl Lukacs*
pkl@hattislaw.com
400 108th Ave NE, Ste. 500
Bellevue, WA 98004
(425) 233-8650
(425) 412-7171 (fax)

*Attorneys for Plaintiffs and the Proposed Class*

*\*Pro hac vice application to be submitted*

1992930.3