UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RANDALL BYRNE, DAVID KLEUSKENS, JERRY HENRY, JASON WEBER, SUSAN FOSTER-HARPER, and LISA KINELL, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, SPECTRUM MID-AMERICA, LLC, and SPECTRUM NORTHEAST, LLC,<br><br>     Defendants. | Civil Action No. 3:20-cv-712 (CSH)<br><br>JANUARY 14, 2022 |

**RULING ON CHARTER'S
MOTION TO DISMISS COMPLAINT OR TO COMPEL ARBITRATION**

**HAIGHT, Senior District Judge:**

This is a purported class action brought by six individual Plaintiffs who subscribed to cable television service packages disseminated by the corporate Defendants ("Charter").[1] Plaintiffs assert that they and putative class members suffered monetary damages as the result of Charter's conduct of its cable television service business in an unfair, false, misleading, or deceptive fashion. Charter denies all allegations of wrongdoing. This Court's subject matter jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

Charter has moved to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) or—in the alternative—to compel submission of the underlying disputes of five of the six Plaintiffs to arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 4. Plaintiffs resist both

---
[1] The parties in their motion papers refer to the Defendants collectively as "Charter," and I will do so in this Ruling.

motions. This Ruling decides them.

I

The services Charter provides, and the use Plaintiffs make of them, furnish dramatic evidence of the changes that have occurred in home entertainment over the course of a single lifetime.

Not long ago, as eternity measures time, there was no television and consequently no cable television programming. People had devices called "radios" in their homes. In the New York City area, radio owners listened principally to the four leading commercial stations—WEAF, WOR, WJZ and WABC—and the occasional independent station like WQXR (classical music). A consumer accessed those services by turning his or her radio on, turning the device's dial to a station's number, and listening to the program then being broadcast.

The television owner of today turns the device on and is confronted with literally hundreds of cable television channels to which he or she can watch and listen. Companies like Charter exist that bring order out of seeming chaos by selecting particular cable television channels and arranging them in designated groups or "packages," which are made available to television program consumers upon payment of monthly subscription fees.

II

In the case at bar, six individual Plaintiffs—Randall Byrne ("Byrne"), David Kleuskens ("Kleuskens"), Jerry Henry ("Henry"), Jason Weber ("Weber"), Susan Foster-Harper ("Foster-Harper"), and Lisa Kinell ("Kinell")—allege that they have been subscribers to cable television service packages disseminated by Defendant Charter Communications, Inc. and/or one of its subsidiaries, Defendants Charter Communications Operating, LLC, Spectrum Mid-America, LLC, and Spectrum Northeast, LLC.

Plaintiffs' Second Amended Complaint ("SAC") is the operative pleading. Of their

number, Plaintiffs allege that Byrne and Kleuskens are citizens of Ohio; that Henry is a citizen of Florida who resides in Ohio from May through October each year; that Weber and Foster-Harper are citizens of Kentucky; and that Kinell is a citizen of Massachusetts. SAC [Doc. 50] ¶¶ 12–17. The Charter entities, meanwhile, are alleged to have been formed under Delaware law, with offices located principally in Connecticut. *Id.* ¶¶ 18–21. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).[2]

Plaintiffs' theory of the case is a straightforward one. Plaintiffs allege that Charter has engaged in

> a bait-and-switch scheme whereby Charter advertises to consumers that its cable television service packages will have a fixed monthly rate for a period of one to two years, but after consumers sign up or renew their service for the promised fixed-rate period, Charter . . . increases the monthly rate in multiple deceptive ways.

SAC ¶ 1. Plaintiffs claim that these "deceptive ways" include: (1) adding a "Broadcast TV Surcharge" to each monthly bill for every customer, and regularly increasing the surcharge; (2) promising customers a "discounted" monthly price, without disclosing that the "discount" is pegged to a list price rate that Charter increases at its whim; (3) removing channels originally presented as

---

[2] Plaintiffs allege that Defendant Charter Communications, Inc. is a Delaware corporation that maintains its principal place of business in Stamford, Connecticut. SAC ¶ 18. Charter Communications, Inc. therefore is a citizen of Delaware and Connecticut. 28 U.S.C. § 1332(c)(1). The other Charter entities that are named as Defendants in this action are limited liability companies, and thus are citizens of the states of which their members are citizens. *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt.*, 692 F.3d 42, 49 (2d Cir. 2012). Plaintiffs do not clearly allege the citizenship of any of these limited liability companies: Plaintiffs only state that the members of Charter Communications Operating, LLC are "residents" of Connecticut and Missouri, and that Spectrum Mid-America, LLC and Spectrum Northeast, LLC are formed pursuant to Delaware law. *See* SAC ¶¶ 19–21. Were this an action brought pursuant to the Court's ordinary grant of diversity jurisdiction, 28 U.S.C. § 1332(a)(1), these allegations would not be sufficient to demonstrate that the Court has subject matter jurisdiction, since the Court would not be able to determine whether complete diversity plausibly exists among the parties. *See, e.g., Tarpon Bay Partners LLC v. Visium Techs., Inc.*, No. 3:18-CV-02003-CSH, 2021 WL 4776520 (D. Conn. Oct. 13, 2021); *Mayes v. Women's Health Ctr. of Shelton Conn.*, No. 3:20-cv-1666 (CSH), 2021 WL 1105287 (D. Conn. Mar. 22, 2021); *Lannunziata v. Am. Stock Transfer & Tr. Co., LLC*, No. 3:20-CV-1865 (CSH), 2021 WL 268856 (D. Conn. Jan. 27, 2021). However, the jurisdiction granted to this Court by the Class Action Fairness Act requires only *minimal* diversity among the parties. 28 U.S.C. § 1332(d)(2)(A) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which *any* member of a class of plaintiffs is a citizen of a State different from *any* defendant) (emphasis added). Since all Plaintiffs appear to be of diverse citizenship from at least Charter Communications, Inc., and Plaintiffs allege the aggregate amount in controversy exceeds $5,000,000 (exclusive of interest and costs), SAC ¶ 9, the jurisdictional threshold set by the Class

part of a cable television service package, and then charging additional fees to include those channels going forward; and (4) increasing the monthly price of customer equipment such as cable boxes, which customers use to receive television service.  *Id.* ¶¶ 2–6.

Plaintiffs' action purports to be on behalf of three classes of Charter customers and invokes the class action provisions in Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).  *Id.* ¶ 178.  Specifically, Plaintiffs Byrne, Kleuskens and Henry seek to represent an "Ohio Class" consisting of persons who purchased television service from Charter and "resided or received Charter television service in Ohio."  *Id.* ¶ 179.  Plaintiffs Weber and Foster-Harper seek to represent Charter television customers who "resided or received Charter television service in Kentucky."  *Id.* ¶ 180.  Plaintiff Kinell seeks to represent Charter television customers who "resided or received Charter television service in Massachusetts."  *Id.* ¶ 181.

III

When Charter's alternative motions came on for oral argument, counsel for Charter began contentions in support of Charter's motion to compel arbitration and then discussed Charter's motion to dismiss the complaint.  As the hearing progressed, counsel for both sides presented arguments in that order.   The Court's discussion in this Ruling shall proceed in similar fashion.

Under the Federal Arbitration Act, where parties to a contract have agreed "to settle by arbitration a controversy thereafter arising out of such contract," the parties' agreement to arbitrate their dispute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The statute "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution."  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (quoting *Preston v. Ferrer*, 552 U.S. 346, 349 (2008)); *see also, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016)

Action Fairness Act appears to be satisfied in this matter.

("The Supreme Court has repeatedly instructed that the [Federal Arbitration Act] 'embodies a national policy favoring arbitration.'") (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011))). If a party to an arbitration agreement resists his or her counterpart's efforts to arbitrate a dispute, the party seeking arbitration "may petition [a district court] for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

"When considering a motion to compel arbitration, courts must resolve two questions: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" *Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 756 (S.D.N.Y. 2019) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)).[3] In determining whether the parties have agreed to arbitrate—i.e., whether an arbitration agreement has been formed—the court applies state substantive law. *See, e.g.*, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019); *see also Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-CV-00767 (CSH), 2017 WL 396535, at *2 (D. Conn. Jan. 30, 2017) ("Although the FAA creates a body of federal substantive law regarding arbitration, 'in evaluating whether the parties have entered in a valid arbitration agreement, the court must look to state law principles.'" (quoting *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003))). A "party seeking to compel arbitration 'must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement in issue.'" *Scott v. Griswold Home Care*, No. 3:19-CV-527 (SRU), 2020 WL 2736020, at *1 (D. Conn. May 26, 2020) (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010)). In resolving the dispute, the court "applies a standard comparable to the standard for summary

---

[3] The first question—i.e., whether the parties have formed an agreement to arbitrate—is reserved for the court to decide in all cases, although the second may be delegated to the parties' arbitrator. *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) ("[P]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place. . . . An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all. And if it is not a contract, it cannot serve as the basis for compelling arbitration." (citing *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 298–301 (2010))).

judgment: if there is no genuine issue of material fact concerning the formation or scope of the agreement, the court must decide as a matter of law to compel arbitration." *Murphy v. Glencore Ltd.*, No. 3:18-CV-01027 (CSH), 2019 WL 549139, at *2 (D. Conn. Feb. 11, 2019) (footnote and citations omitted).

As for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), such a motion is decided on "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Lunardini v. Mass. Mut. Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) (citing *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) and *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). In order to survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Although a court must accept as true all the factual allegations in the complaint, that requirement is 'inapplicable to legal conclusions.'" *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). In deciding a motion to dismiss under Rule 12(b)(6), "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

IV

Charter contends that five of the six Plaintiffs—Kleuskens, Henry, Weber, Foster-Harper, and Kinell—have "each assented to arbitration pursuant to an arbitration agreement . . . in Charter's Terms of Service," and thus should be compelled to arbitrate their claims, since all issues regarding

6

not only the merits of those claims but also their arbitrability have been delegated to the arbitrator to decide. *See* Defs.' Mem [Doc. 53] at 2, 29–33.[4]  These five Plaintiffs prefer not to arbitrate their "bait and switch" claims against Charter, and thus have opposed Charter's efforts to compel arbitration, arguing that the arbitration agreement is illusory, and that even if it is not illusory Plaintiffs never sufficiently manifested their asset to it. *See* Pls.' Mem. [Doc. 75] at 1, 8–17.

As suggested in Plaintiffs' Second Amended Complaint, and as confirmed in a declaration filed by Charter alongside the present motion, an individual who wishes to receive Charter's services in his or her home must agree to Charter's Residential General Terms and Conditions of Service (the "General Terms") when signing-up for (or renewing) Charter's television services. *See* SAC ¶ 42; Flores Decl. [Doc. 53-1] ¶ 11.  The General Terms is one of the documents that govern the relationship between Charter and its subscribers. *See* Flores Decl. ¶ 15.  Residential subscribers of Charter's television services additionally are subject to Charter's Video Services Agreement, which the General Terms incorporates by reference. *Id.* ¶¶ 10, 18.  Charter's relationship with a subscriber is structured as a month-to-month agreement that automatically renews until it is terminated by one of the parties. *See* General Terms [Doc. 53-2] § 17(a).

The General Terms includes an arbitration agreement—a fact prominently advertised in the document's preliminary paragraphs. *See* General Terms pmbl.  The arbitration clause of the General Terms provides that, subject to certain limited exceptions not relevant here, "Spectrum [i.e., Charter] and Subscriber agree to arbitrate disputes and claims arising out of or relating to these General Terms, the Services, the Equipment, or marketing of the Services Subscriber has received from Spectrum." General Terms § 29.  The agreement further provides that any arbitration between Charter and a subscriber will be administered by the American Arbitration Association and according to the rules of that organization. *Id.*  The General Terms additionally recites, in all

---

[4] Plaintiff Byrne's situation is different, as will be discussed later in this opinion. *See infra* at V–VI.

capital letters: "SUBSCRIBER AGREES THAT, BY ENTERING INTO THIS AGREEMENT, SUBSCRIBER AND SPECTRUM ARE WAIVING THE RIGHT TO A TRIAL BY JUDGE OR JURY. . . . SUBSCRIBER AND SPECTRUM AGREE THAT CLAIMS MAY ONLY BE BROUGHT IN SUBSCRIBER'S INDIVIDUAL CAPACITY AND NOT ON BEHALF OF, OR AS PART OF, A CLASS ACTION OR REPRESENTATIVE PROCEEDING." *Id.* Finally, the General Terms expressly gives a subscriber the right to opt out of the arbitration agreement by submitting written notice to Charter within thirty days of the arbitration agreement's becoming effective. *See id.*

Charter obtains its customers' agreement to the General Terms, including the arbitration agreement it contains, in a number of ways. A customer may assent to the General Terms by signing a hard copy when a Charter technician sets up a customer's television service and the service commences. Flores Decl. ¶ 12. A customer also can asset to the General Terms by clicking "I Agree" when reviewing a copy of the General Terms posted on Charter's website, which is recorded in a Charter database. *Id.* ¶ 13. Finally, a customer manifests agreement to the General Terms by continuing to receive, use, and pay for Charter's services after being notified on monthly billing statements of changes to the General Terms. *Id.* ¶ 14.

As reflected in Charter's declaration in support of its motion and the exhibits attached thereto, it is apparent that five of the six Plaintiffs followed either the second or third course of action, or both, in agreeing to the General Terms. The record shows that Plaintiffs Kleuskens, Weber, Foster-Harper, and Kinell all assented to the arbitration provision by clicking "I Agree" when presented with electronic versions of the General Terms. *Id.* ¶¶ 30, 33, 35, 37. These plaintiffs also assented to the agreement by continuing to use and pay for Charter's services after receiving notices on their billing statements. *Id.* ¶¶ 29, 32, 34, 36. Plaintiff Henry similarly continued to use and pay for Charter's services following notice of the General Terms. *Id.* ¶ 31.

There is no evidence that any of these Plaintiffs exercised the opt-out right expressly provided in the General Terms' provision concerning arbitration. *Id.* ¶ 39. Accordingly, even viewing matters in the light most favorable to Plaintiffs (as the non-moving parties), there is no substantial dispute that these Plaintiffs *agreed* to the General Terms, including the arbitration provision contained therein.[5]

The case having progressed through several rounds of briefing, both before and after oral argument, I concur with Plaintiffs' assessment in their most recent supplemental brief that "[t]he primary issue before this Court is whether Charter's Terms of Service are an illusory contract," since "parties cannot enforce even an agreed-to illusory contract." Pls.' Supp. Opp. [Doc. 86] at 1. In other words: if the contract between Charter and the Plaintiffs is illusory, it is void, and the arbitration clause falls with it.

Plaintiffs' contention that their contract with Charter is illusory depends upon the modification provision contained in Charter's Residential Video Services Agreement (the "Video Services Agreement"), which provides in full:

> Amendment: Spectrum may, in its sole discretion, change, modify, add or remove portions of the Terms of Service at any time. Spectrum may notify You [i.e., the subscriber] of any such changes by posting notice of such changes on Spectrum's website at www.spectrum.com/policies/terms-of-service[,] using the features of the Spectrum digital receiver, or sending notice via bill statement, text, e-mail, postal mail, or other reasonable means. Your continued use of the Video Services following notice of such change, modification or amendment shall be deemed to be the [sic] Your acceptance of any such modification. If You do not agree to any modification of the Terms of Service, You must immediately cease using the Video Services and notify Spectrum that You are terminating the Video Services in accordance with the Terms of Services.

---

[5] The sufficiency of Plaintiffs' agreement to the arbitration clause by the means discussed herein is established by case law. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'") (citation omitted); *Olsen v. Charter Commc'ns, Inc.*, No. 18-cv-3388 (JGK), 2019 WL 3779190, at *6 (S.D.N.Y. Aug. 9, 2019) (Koeltl, *J.*) ("The Updated Terms themselves also provided sufficient notice of the arbitration provision. . . . Subsequently, the plaintiffs manifested their assent to the Updated Terms. They paid their June and July billing statements without objection, and they continued to accept Charter's internet services afterwards.").

Video Services Agreement [Doc. 53-3] § 9.

Plaintiffs submit that this "modification provision renders Charter's collective Terms—and the arbitration provision in them—illusory," because (Plaintiffs claim) it grants Charter "unlimited unilateral authority to change any of its Terms" without notice to subscribers, including authority to modify or revoke the arbitration agreement contained in the General Terms, as well as the ability to make changes to the General Terms (and/or the Video Services Agreement) that have retroactive effect. Pls.' Mem. at 12. Plaintiffs contend that the modification provision thus means the General Terms and the Video Services Agreement "do not actually create any binding obligations on Charter that could constitute consideration." *Id.* I do not agree.

The concept of an "illusory contract" has generated a number of real court decisions. Not infrequently, a party maligns a contract as illusory and therefore unenforceable in an effort to avoid an unwelcome outcome under the agreement. *Flood v. ClearOne Communications, Inc.*, 618 F.3d 1110 (10th Cir. 2010), an opinion by Circuit Judge Gorsuch (as he then was), is illustrative. In that case, Plaintiff Flood sought to prevent Defendant ClearOne Communications from ceasing to advance the costs of her criminal defense, arguing, *inter alia*, that the interpretation of the parties' agreement on which the defendant based its actions—which depended on the agreement's incorporation by reference of the defendant's bylaws—rendered the agreement illusory. The district court agreed, *see Flood v. ClearOne Commc'ns, Inc.*, No. 2:08-CV-631, 2009 WL 87006, at *4–*5 (D. Utah Jan. 12, 2009), but the Tenth Circuit rejected that contention. Judge Gorsuch's opinion, drawing upon case law and the *Corbin* and *Williston* treatises, reasoned:

> By the phrase "illusory promise" is meant words in promissory form that promise nothing. One of the most common types of promises that is too indefinite for legal enforcement . . . is one where the promisor retains an *unlimited* right to decide later the nature or extent of his or her performance. This *unlimited* choice in effect destroys the promise and makes it illusory.

10

> None of this, however, describes the agreement before us. The parties didn't just recite a series of words that amounted to *nothing*. And they didn't leave the question whether to advance fees to ClearOne's unfettered whim. Instead, the company agreed to advance fees subject to certain express conditions. . . . In the contract before us, then, the company's right to refuse or terminate advancement *wasn't* left to the company's unlimited choice, but was restricted by the parties' agreement, tied to considerations associated with (among other things) the reasonableness of Ms. Flood's expenses and the company's financial health.

618 F.3d at 1119–1120 (citations and internal quotation marks omitted, emphases in original).

When one applies Judge Gorsuch's analysis of "illusory promises" in *Flood* to the modification provision of Charter's Video Services Agreement in this case, it is apparent that that provision does not render Plaintiffs' contract with Charter (including the arbitration agreement contained in the General Terms) illusory. Considering the provision in its entirety, Section 9 does not confer upon Charter the *unlimited* or *unfettered* right to change the terms of the services it renders to customers. On the contrary: Section 9 first mandates that Charter give customers notice of intended changes to the terms, and it then gives customers the option of agreeing to the changes (by continuing to accept Charter's services) or rejecting the changes (by ceasing to use the services in accordance with the procedures set forth in the General Terms). Although Section 9 does not require that Charter give customers extended advance notice of term modifications, or grant customers extended time to decide whether to agree to them, these are questions of form, not substance. Under the *Flood* analysis, customers' ability to accept or reject notified changes in Charter's terms of service preserves the contract from being discarded as illusory, a concept that would apply only if Charter as "promisor retains an *unlimited* right to decide later the nature or extent of [its] performance." *Id.* at 1120.

Applying the same basic principles, the Fifth Circuit reached the same conclusion in *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004), a case much like the one at the bar. There, the Fifth Circuit considered a putative class action for breach of contract by

11

cellular telephone users against three cellular telephone service providers. Certain plaintiffs sought to avoid arbitration clauses in their contracts because the contracts also included clauses permitting the service providers to change the terms of the agreements, which plaintiffs argued rendered the agreements illusory.

The Fifth Circuit rejected the plaintiffs' contention. The court noted that under the contracts in suit, "the defendant companies are required to give the customer notice of the proposed change," thus distinguishing the contracts from ones where no notice was required, and went on to reason:

> The change-in-terms provisions in the contracts before us do not render the contracts' obligations illusory. The notice of the change in terms can be understood as an invitation to enter into a relationship governed by the new terms. The customer then accepts the new terms by continuing to use the service. The fact that the company has the right to change the terms upon notice does not mean that the contract never bound it. Nor does the fact that the companies could later attempt to change the arbitration clause to render it oppressive mean that the arbitration clause, as it stands, is unconscionable.

379 F.3d at 173–174 (footnote and citations omitted). This analysis is squarely applicable to the circumstances of the case at bar: here, as there, the service provider is required to provide notice of the intended change, and the customer has the choice of accepting the new arrangement or ceasing to use the services, and these respective promises by the parties together are sufficient to constitute valid consideration.

Furthermore, the Court's ruling is informed by *Cova v. Charter Communications, Inc.,* No. 4:16-cv-469-RLW, 2017 WL 666097 (E.D. Mo. Feb. 17, 2017), a case the parties have extensively discussed in their briefs, and which similarly concerned customers' efforts to avoid the effect of arbitration agreements contained in Charter's terms of service. In *Cova*, Charter's 2013 terms of service—a predecessor to the General Terms at issue here—reserved to Charter the right to modify the subscriber agreement and stated that customers' continuing to receive Charter's services would

constitute their acceptance of any modified terms (*without* overtly providing subscribers a method to reject Charter's changes). *See* Pls' Resp. to Def.'s Mot. to Compel Individual Arbs. at 14 n.4, *Cova,* 2017 WL 666097, ECF No. 26 [Doc. 82-1]. In 2014, Charter gave its customers notice of impending modifications of the terms through their monthly bills, which included a modification of the change-in-terms provision that eliminated the 2013 clause's explicit thirty-day notice period (but which continued not to provide subscribers an overt method to reject Charter's changes). *See id* at 14 n.5; *see also Cova*, 2017 WL 666097 at *1–*2. Both the original and revised agreements contained arbitration provisions, which were substantively identical. *Cova*, 2017 WL 666097 at *1–*2. None of the plaintiff-subscribers attempted to reject these changes following Charter's notice, rather continuing to receive and use Charter's services; the plaintiffs additionally did not exercise the opt-out rights contained in the arbitration provisions. *Id.* The district court thus compelled the individual customers to arbitrate their claims against Charter, reasoning:

> Charter gave Plaintiffs notice that the terms and conditions of their contract with Charter would be changed by an effective date and directed Plaintiffs to the location where those restructured terms were stated. Charter also gave Plaintiffs an opportunity to opt out of the arbitration provision, but Plaintiffs did not do so. Thus, the Court holds that Plaintiffs accepted the revised contractual terms, including the arbitration provisions, by continuing their service with Charter.

*Id.* at *5. Moreover, the district court rejected the contention that the modification clauses of the terms of service rendered the arbitration provisions illusory, finding that "Charter could not change[] the terms and conditions without notice, retroactively and unilaterally. Rather, the agreement provides that Charter would provide advanced notice of any changes and that the subscriber's continued use of the service after notice of the change would constitute acceptance of change." *Id.*

While I am not bound by the Tenth and Fifth Circuit cases discussed *supra*, nor the district court's ruling in *Cova*, I find them persuasive. I am not cited to, nor have I found, a decision by

the Second Circuit that considers a contract found to be illusory in similar circumstances. However, the Second Circuit has indicated that it does not favor discarding contracts as illusory. *See, e.g.*, *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 60 (2d Cir. 2017) ("An interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred." (quotation marks and citation omitted)); *Umbach v. Carrington Investment Partners (US), LP*, 851 F.3d 147, 158 (2d Cir. 2017) ("The court is to read a contract as a whole and give each provision and term effect, so as not to render any part of the contract mere surplusage, or illusory or meaningless" (quotation marks and citations omitted)).

Plaintiffs also offer no principled reason why *Cova* should be distinguished from the case at the bar. Plaintiffs suggest that "*Cova* has little relevance here because it applied Missouri law," Pls.' Sur-Reply [Doc. 81] at 3, but I am unable to discern how—if at all—Missouri law on illusory contract terms differs from the laws of the states that I am to apply here (namely, Ohio, Kentucky, and Massachusetts). Indeed, I suspect that there is no substantial difference. *See, e.g.*, *Wainblat v. Comcast Cable Commc'ns, LLC*, No. 19-10976-FDS, 2019 WL 5698446 (D. Mass. Nov. 4, 2019) (applying Massachusetts law and holding that modification clause of cable provider's terms of service that contained both notice obligation and rejection right for subscribers did not render agreement illusory, thus requiring parties to arbitrate).

At bottom, Plaintiffs' briefs cite a number of cases from several jurisdictions on the issue of illusory contracts, but Plaintiffs cite no case, in the Second Circuit or elsewhere, holding that a service provider's right to modify its terms of service on notice, *accompanied by* a customer's attendant right either to accept the modification or to reject it by ceasing to use the service, renders the underlying contract illusory and an arbitration clause unenforceable. Such a proposition would be contrary to the clear weight of authority, derived from a number of jurisdictions, as the cases cited *supra* demonstrate. Indeed, some of the cases cited by Plaintiffs themselves point in the

14

direction of the Court's decision. *Cf., e.g.*, *In re Zapos.com, Inc. v. Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065 (D. Nev. 2012) ("Most federal courts that have considered this issue have held that if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and unenforceable, *especially where there is no obligation to receive consent from, or even notify, the other parties to the contract*." (emphasis added)); *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1034 (D. Colo. 2012) (holding that subscriber's agreement with internet provider that required parties to arbitrate disputes was illusory, under Colorado law, because although agreement required provider to post changes to its website, "[a] notice requirement becomes significant when it is coupled with the right to accept or reject the change. Here, nothing in the Subscriber Agreement indicates that Qwest's changes to the Subscriber Agreement are subject to delayed effect for consideration by the user or to the user's . . . consent"); *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 86–87 (holding that, under Texas law, arbitration agreement was illusory because unilateral modification provision allowed retailer to make changes to customer loyalty program without notice and with retroactive effect).

On the basis of the clear weight of authority, I conclude that the contracts between Charter and the individual Plaintiffs are not illusory. It follows that the arbitration agreement in the contracts is enforceable by Charter. This ruling applies to five of the six Plaintiffs: specifically, Kleuskens, Henry, Weber, Foster-Harper, and Kinell.

V

While the record is not entirely clear on the point, the parties seem to agree that Byrne, alone among the individual Plaintiffs, is *not* bound to arbitrate his dispute with Charter. Charter has described Byrne as "the only Plaintiff to opt out of arbitration," *see* Defs.' Reply [Doc. 77] at 10,[6] and Charter's records appear to imply that he is so situated, *see* Flores Decl. ¶ 39. Meanwhile,

---

[6] *See also* Hr'g Tr. [Doc. 85] at 18:22–23 ("[Ms. Tatum:] Of course, now we have Mr. Byrne, who Your Honor has

throughout the litigation thus far, counsel for Plaintiffs have accepted Byrne's special status as the one Plaintiff not subject to an arbitration agreement—the "Sixth Man," as counsel and the Court referred to Byrne during the oral argument.

In these circumstances, the Court must give separate consideration to the effect of this ruling upon the five Plaintiffs who have not opted out of arbitration on the one hand, and upon Plaintiff Byrne on the other.

As for the five Plaintiffs who are bound to arbitrate their claims against Charter, the Court will grant Charter's motion to compel arbitration, direct those Plaintiffs to proceed to arbitration, and stay the action pending the conclusion of the arbitration. This is the course required by the Federal Arbitration Act, as interpreted in this Circuit. *See Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the [Federal Arbitration Act] mandate a stay of proceedings when all the claims in an action have been referred to arbitration and a stay requested."). Judge Koeltl followed this course in *Olsen v. Charter Communications, Inc.*, No. 18-cv-3388 (JGK), 2019 WL 3779190 (S.D.N.Y. Aug. 9, 2019), an action against Charter asserting similar claims under terms of service similar to those in issue here. I use Judge Koeltl's order as a useful and instructive model, *infra*.

VI

It thus remains for the Court to consider what it should direct with respect to the "Sixth Man"—i.e., Byrne—who is not bound by the arbitration agreement to which the other five Plaintiffs have acceded.

Charter submits that "the Court should exercise its inherent authority to stay Mr. Byrne's individual action until the arbitration proceedings conclude." Defs.' Suppl. Br. [Doc. 87] at 3; *see also* Defs.' Mem. at 1, 3, 37. Counsel for Plaintiffs contend that Byrne should simply be allowed

---

pointed out is the opt-out Plaintiff.").

to get on with his claims against Charter under Ohio law, uninhibited or undeterred by an arbitration proceeding to which Byrne is not himself a formal party. Pls.' Mem. at 17–18; *see also* Hr'g Tr. [Doc. 85] at 63:7–15 ("Mr. Selz: If [Byrne] had his [own] case, then he would just be able to proceed before Your Honor and . . . advance his claims. So the fact that he's co-plaintiff[] with these other five shouldn't prejudice him in his ability to prosecute his claims. And . . . the case or cases that Charter provided in its motion doesn't support the idea that a separate plaintiff in Mr. Byrne's situation would have to wait.").

At first blush, it seems counterintuitive to suggest that Byrne's action at law should be delayed by a stay pending an arbitration between other parties. I conclude, however, that the particular circumstances of this case favor such a course.

All of the Plaintiffs' complaints about Charter's conduct as a cable television service provider are substantively the same, whether those individual Plaintiffs are from Kentucky, Massachusetts, or Ohio. Indeed, identical legal claims are raised by two of Byrne's Ohio co-Plaintiffs—that is, Plaintiffs Kleuskens and Henry. *See* SAC ¶¶ 190–99, 230–46. Presumably, Charter will defend its conduct in the arbitration with the Kentucky and Massachusetts claimants, as well as those Ohio claimants whom I have found are bound by the arbitration provision. Charter will attempt to persuade the arbitrators it did nothing wrong, and that the customers' claims are entirely without merit.

If the arbitrators accept that contention, and enter an award rejecting those Plaintiffs' clams, one can reasonably anticipate cross-motions in a federal district court under the Federal Arbitration Act to confirm or vacate the award. Confirmation of an arbitration award under the statute is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," and the court "must grant" the confirmation petition unless grounds exist to vacate, modify, or correct the award. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)

(citations and internal quotation marks omitted). Accordingly, it is conceptually possible that Charter might obtain a district court judgment confirming an arbitration award in Charter's favor and rejecting the claims of certain Plaintiffs in their entirety.

The question that arises is whether such a judgment in Charter's favor would have any effect upon the identical claims of Plaintiff Byrne, who opted out of the arbitration agreement with Charter and will not have participated in the arbitration proceeding ordered herein. The question may be regarded as one of issue preclusion.

At a much earlier time, the fact that Byrne was not a party to the arbitration proceeding between Charter and the other customers might have prevented Charter from contending that Byrne was collaterally estopped by an award rejecting the same claims asserted by the other customers. However, decisions of the Second Circuit, other appellate courts, and the Supreme Court demonstrate an evolution in the concepts of claim or issue preclusion, which turned for the most part on principles of res judicata or collateral estoppel. Thus, in *Shore v. Park Lane Hosiery Co., Inc.*, 565 F.2d 815 (1977), *aff'd sub nom. Park Lane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979), the Second Circuit held that in a suit by shareholders, a company was collaterally estopped by adverse rulings in an earlier action brought by the SEC. Judge Mansfield's opinion stated:

> Although the plaintiffs in the two proceedings differ and mutuality of parties was at one time a prerequisite for application of the doctrine of collateral estoppel, this court in *Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir. 1964), . . . dispensed with mutuality as a requirement, taking the view that a requirement of complete identity of parties serves no purpose as long as the person against whom the findings are asserted or his privy has had a full and fair opportunity to litigate the identical issue in the prior action.

565 F.2d at 818–819 (some citations omitted).

Given this reasoning by the Second Circuit in *Shore*, it seems arguable in the case at bar that Byrne's claims against Charter could be precluded by a full and fair arbitration that rejects precisely the same claims in what originally was brought as one putative class action, albeit asserted by

different customers but represented by the same attorneys. I put the prospects of a preclusive effect no higher than that, and the parties have not briefed the issue. I will further note that even if preclusion principles ultimately do not apply to Byrne's claims, the arbitration proceedings involving his co-Plaintiffs still may help simplify the management of his claims in this Court: counsel for both sides presumably will have sharpened their legal arguments during the arbitration and (if discovery becomes necessary) have resolved most discovery issues, allowing this Court to proceed with greater speed towards resolution of Byrne's dispute.

In total, the circumstances of the case persuade me that it is preferable, in the exercise of my discretion, to stay Plaintiff Byrne's action against Charter pending completion of the arbitration of the same claims between Charter and Byrne's co-Plaintiffs, so we will know how that arbitration comes out.[7]

I do not reach Charter's alternative motion to dismiss Byrne's claims. Nor do I reach the question of whether Byrne's action should be certified as a class action. Those decisions are for another day.

## VII

For the foregoing reasons, the Court makes this Order:

1. Defendants' Motion to Compel Arbitration is GRANTED as to Plaintiffs Kleuskens, Henry, Weber, Foster-Harper, and Kinell. These Plaintiffs are directed to proceed to arbitration in the manner provided in the arbitration agreement between these Plaintiffs and Defendants.

2. The action between the Plaintiffs identified in Paragraph 1 of this Order and Defendants

---

[7] "Under its inherent power to manage its docket, a district court can stay a case pending arbitration when the arbitration may determine issues involved in the case, even when the parties to the stayed action are not the parties involved in the arbitration." *Donjon Marine Co. v. Water Quality Ins. Syndicate*, 523 F. App'x 738, 740 (2d Cir. 2013) (citing *Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir.1964)). A party seeking a stay in those circumstances must show "that [it has] not taken nor will take any steps to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship." *Id.* (quoting *Isenbrandtsen*, 339 F.2d at 442). In the case at bar, the submissions of counsel to date do not raise any of these issues as obstacles to a stay of Byrne's claims pending the

is STAYED, pending completion of the arbitration proceedings.

3. In the exercise of the Court's discretion, the action between Plaintiff Byrne and Defendants is STAYED, pending the completion of the arbitration proceedings between Defendants and the Plaintiffs identified in Paragraph 1 of this Order.

4. Defendants' alternative Motion to Dismiss the action is DENIED AS MOOT.

It is SO ORDERED.

Dated: New Haven, Connecticut
January 14, 2022

*s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

arbitration of those brought by the other Plaintiffs.